ANGELO GARIFINE, PLAINTIFF-APPELLANT, v. MONMOUTH PARK JOCKEY CLUB, A NEW JERSEY CORPORATION, AND THOROUGHBRED RACING PROTECTIVE BUREAU, INC., A NEW YORK CORPORATION, DEFENDANTS-RESPONDENTS.

Argued November 17 and 18, 1958—Decided January 19, 1959.

*Mr. Vincent C. De Maio* argued the cause for the appellant (*Messrs. Heuser, Heuser & De Maio,* attorneys).

*Mr. Robert N. Wilentz* argued the cause for the respondents (*Messrs. Wilentz, Goldman, Spitzer & Sills,* attorneys).

The opinion of the court was delivered by

JACOBS, J.    This is an appeal from the Chancery Division's refusal to grant the plaintiff's request for injunctive

relief against his exclusion and expulsion from the Monmouth Park race track. We certified the appeal on our own motion while it was pending in the Appellate Division.

The defendant Monmouth Park Jockey Club is a New Jersey corporation which operates the Monmouth Park race track at Oceanport. It employs the defendant Thoroughbred Racing Protective Bureau, Inc., a New York corporation, to police the grounds on which its horse races are conducted. On July 2, July 8, and July 9, 1955 the plaintiff Angelo Garifine entered the track after paying the customary admission fee but left when he was requested to do so by a representative of the Protective Bureau. On July 11, 1955 the plaintiff was again requested to leave the track but he refused and was arrested and charged with being a disorderly person. He was acquitted in proceedings before the local magistrate. On December 13, 1956 he filed an action in the Superior Court seeking damages in three separate counts, for malicious prosecution, false arrest, and deprivation of his right to attend the track. On motion the counts, other than the count relating to malicious prosecution, were dismissed. On June 11 and June 12, 1957 the plaintiff attended the races at the Monmouth Park race track, and on June 12, 1957 a representative of the defendants swore out a warrant and complaint charging him with being a trespasser.

On June 19, 1957 the plaintiff filed his complaint in the Chancery Division seeking injunctive relief against his further exclusion and expulsion from the race track. His complaint stated that he had never been convicted of a crime, although he was once charged with being a bookmaker and was acquitted. It also stated that he had inquired concerning the reason for his expulsions and had been told "that he is not wanted, that he is an undesirable, and that his general record and reputation warrants his exclusion." The defendants moved to dismiss the plaintiff's complaint on the ground that they had "an absolute right" to exclude and expel the plaintiff and that consequently he had no claim for injunctive relief. On April 22, 1958 the

Chancery Division granted the defendants' motion and dismissed the complaint. In attacking this action the appellant urges (1) that notwithstanding the holding of the former Supreme Court in *Shubert v. Nixon Amusement Co.*, 83 *N. J. L.* 101 (*Sup. Ct.* 1912), the operator of a licensed race track should not have the common-law right to exclude or expel a patron without reasonable cause, and (2) that under the provisions of the Civil Rights Act of New Jersey (*R. S.* 10:1-2 *et seq.*) the operator of a licensed race track has no such right.

■ There was a time in English history when the common law recognized in many callings the duty to serve the public without discrimination. See *Arterburn, "The Origin and First Test of Public Callings,"* 75 *U. Pa. L. Rev.* 411 (1927). *Cf. Burdick, "The Origin of the Peculiar Duties of Public Service Companies,"* 11 *Colum. L. Rev.* 514 (1911); *Wyman, "The Law of the Public Callings as a Solution of the Trust Problem,"* 17 *Harv. L. Rev.* 156 (1904). With the passing of time and the changing of conditions, the common law confined this duty to exceptional callings where the needs of the public urgently called for its continuance. Innkeepers and common carriers may be said to be the most notable illustrations of business operators who, both under early principles and under the common law today, are obliged to serve the public without discrimination; in *Delaware, L. & W. R. Co. v. Trautwein*, 52 *N. J. L.* 169, 171 (*E. & A.* 1889), Justice Depue aptly described this obligation as "a duty imposed by law from considerations of public policy." See *Weehawken Tp. v. Erie Railroad Co.*, 20 *N. J.* 572, 581 (1956); *Messenger v. Pennsylvania R. Co.*, 37 *N. J. L.* 531, 533 (*E. & A.* 1874). *Cf. Pinkerton v. Woodward*, 33 *Cal.* 557, 91 *Am. Dec.* 657, 660 (*Sup. Ct.* 1867). On the other hand, operators of most businesses, including places of amusement such as race tracks, have never been placed under any such common-law obligation, for no comparable considerations of public policy have ever so dictated. See *Madden v. Queens County Jockey Club*, 296 *N. Y.* 249, 72 *N. E. 2d* 697, 1 *A. L. R. 2d* 1160 (*Ct. App.* 1947), *certiorari*

denied 332 *U. S.* 761, 68 *S. Ct.* 63, 92 *L. Ed.* 346 (1947);
*Greenfeld v. Maryland Jockey Club,* 190 *Md.* 96, 57 *A.*
*2d* 335 (*Ct. App.* 1948). *Cf. Marrone v. Washington Jockey*
*Club,* 227 *U. S.* 633, 33 *S. Ct.* 401, 57 *L. Ed.* 679 (1913);
*Martin v. Monmouth Park Jockey Club,* 145 *F. Supp.* 439
(*D. C. D. N. J.* 1956), affirmed 242 *F. 2d* 344 (3 *Cir.*
1957); *Watkins v. Oaklawn Jockey Club,* 86 *F. Supp.* 1006
(*D. C. Ark.* 1949), affirmed 183 *F. 2d* 440 (8 *Cir.* 1950);
*Turner and Kennedy, "Exclusion, Ejection, and Segrega-*
*tion of Theater Patrons,"* 32 *Iowa L. Rev.* 625, 626 (1947);
*Annotation "Refusing admission to, or ejecting from, place*
*of amusement,"* 30 *A. L. R.* 951 (1924); 60 *A. L. R.* 1089
(1929); 86 *C. J. S. Theaters and Shows,* § 31, *p.* 709
(1954); 52 *Am. Jur., Theaters, Shows, Exhibitions, etc.,*
§§ 3, 6, *pp.* 255, 257 (1944).

In the well-known case of *Wood v. Leadbitter,* 13 *M. & W.*
838, 153 *Eng. Rep.* 351 (*Ex.* 1845), the court had occasion
to deal, not with an exclusion, but with an ejection from
the Doncaster race course. The plaintiff had purchased
his ticket, had entered the grounds, and had refused to leave
when asked to do so because of some alleged malpractices
on a former occasion. He was forcibly ejected, and sued
in trespass for assault and false imprisonment. In denying
recovery, the court took the position that the plaintiff had
no easement or similar property right entitling him to re-
main on the grounds after the request that he leave, but
had only a personal license which could be revoked at any
time, leaving the plaintiff with only a breach of contract
claim. In *Hurst v. Picture Theatres, Ld.,* [1915] 1 *K. B.*
1 (1914), the court rejected the holding in *Leadbitter* and
allowed recovery in an assault action by the purchaser of
a theatre ticket who was forcibly ejected by the proprietor
who acted on the mistaken belief that the plaintiff had not
paid his admission fee. Lord Justice Buckley expressed
the view that it would be neither good sense nor good law
to hold that a theatre proprietor had the absolute right to
eject a patron who had paid for his ticket and was peaceably
occupying his assigned seat; he considered the theatre ticket

to be a license bearing an agreement not to revoke which equity would enforce. See *Winter Garden Theatre (London), Ld. v. Millennium Productions, Ld.*, [1948] *A. C.* 173, 189. The *Hurst* case has been the subject of extensive discussion; some commentators have approved its result as just and equitable, whereas others have disapproved it as violative of principles of real property law. See *Winfield, Torts,* 389 (*6th ed.* 1954); *Salmond, Torts* 277 (*11th ed.* 1953); *Wade, "What is a License,"* 64 *L. Q. Rev.* 57 (1948); 7 *Holdsworth, A History of English Law* 328 (1925); *Miles, "Hurst v. Picture Theatres, Ltd.,"* 31 *L. Q. Rev.* 217 (1915). In *Cowell v. Rosehill Racecourse Co. Ltd.*, 56 *Commw. L. R.* 605 (1937), the High Court of Australia, with Justice Evatt dissenting, followed *Leadbitter* and declined to allow recovery in an assault action by a patron who had been ejected after he had refused a request to leave the race track. Similarly, the courts throughout the United States have generally adhered to *Leadbitter.* See *Shubert v. Nixon Amusement Co., supra; Woollcott v. Shubert,* 217 *N. Y.* 212, 111 *N. E.* 829, *L. R. A.* 1916*E,* 248 (*Ct. App.* 1916); *Finnesey v. Seattle Baseball Club,* 122 *Wash.* 276, 210 *P.* 679, 30 *A. L. R.* 948 (*Sup. Ct.* 1922); *Meisner v. Detroit, B. I. & W. Ferry Co.,* 154 *Mich.* 545, 118 *N. W.* 14 (1908); *Horney v. Nixon,* 213 *Pa.* 20, 61 *A.* 1088, 1 *L. R. A., N. S.,* 1184 (*Sup. Ct.* 1905); *Burton v. Scherpf,* 83 *Mass.* 133 (*Sup. Jud. Ct.* 1861); *Annotation, "Exclusion of person (for reason other than color or race) from place of public entertainment or amusement,"* 1 *A. L. R.* 2d 1165 (1948).

In *Shubert v. Nixon Amusement Co., supra,* the plaintiff Lee Shubert purchased a ticket for a Newark show of his competitior Florenz Ziegfeld. He took a seat and while occupying it peaceably he was asked to leave. He did so and then filed a tort action against Ziegfeld and the Nixon Amusement Company. His action was dismissed by the former Supreme Court which noted that "whatever views may be entertained as to the natural justice or injustice of ejecting a threatre patron without reason after he has paid for his ticket and taken his seat," it felt constrained

to follow the holding in *Leadbitter* "as the settled law." In *Woollcott v. Shubert, supra,* the New York Court of Appeals took somewhat the same approach. There Alexander Woollcott, a drama critic employed by the *New York Times,* had written an adverse review of a production controlled by Lee Shubert and his associates. They excluded him from one of their theatres and threatened to exclude him from all of them. Mr. Woollcott sought injunctive relief but his action was dismissed[1] in an opinion which read in part as follows:

"The acts of the defendants were within their rights at the common law. At the common law a theater, while affected by a public interest which justified licensing under the police power or for the purpose of revenue, is in no sense public property or a public enter-

---

[1] In his article on *"The Privilege Of Forcibly Ejecting An Amusement Patron,"* 90 *U. Pa. L. Rev.* 809, 821 (1942), Mr. Conard quotes the following self-explanatory letter from Mr. Woollcott:

"As the first gestures failed to induce the Times to send another reviewer to their shows, they [the Shuberts] tried out the system of barring me from the theater. ＊ ＊ ＊ Within ten minutes the Times had excluded all Shubert advertising from its columns and also all allusion to any actor playing in a Shubert theater. Next it instituted in my name an application for permanent injunction. ＊ ＊ ＊ There were thus two entirely separate weapons brought to bear.

"In the case of the legal weapon, we lost. ＊ ＊ ＊ There was some faint-hearted talk of agitation for ＊ ＊ ＊ a statute but at the time I saw no point in it. If a newspaper is pusillanimous the statute would not do its readers any good. If a newspaper is independent in spirit it needs no such statute. This was demonstrated in my own case because, having won the decision in the courts, the Shuberts were no better off than before. Their plays, their players and their advertising were ignored. Under this treatment they soon came begging for my return and even ate crow in the form of an open letter asking me to return."

See the later New York legislation relating to the admission of theatre ticket holders which was held to be constitutional in *Christie v. 46th St. Theatre Corporation,* 265 *App. Div.* 255, 39 *N. Y. S.* 2d 454 (*App. Div.* 1942), affirmed 292 *N. Y.* 520, 54 *N. E.* 2d 206 (*Ct. App.* 1944), 292 *N. Y.* 643, 55 *N. E.* 2d 512 (*Ct. App.* 1944), *certiorari* denied 323 *U. S.* 710, 65 *S. Ct.* 35, 89 *L. Ed.* 571 (1944).

prise. It is not governed by the rules which relate to common carriers or other public utilities. The proprietor does not derive from the state the franchise to initiate and conduct it. His right to and control of it is the same as that of any private citizen in his property and affairs. He has the right to decide who shall be admitted or excluded. His rights at common law, in the respect of controlling the property, entertainments, and audience, have been too recently determined by us to be now questionable. *People ex rel. Burnham v. Flynn*, 189 *N. Y.* 180, 82 *N. E.* 169, 12 *Ann. Cas.* 420; *Collister v. Hayman*, 183 *N. Y.* 250, 76 *N. E.* 20, 1 *L. R. A., N. S.*, 1188, 111 *Am. St. Rep.* 740, 5 *Ann. Cas.* 344; *Aaron v. Ward*, 203 *N. Y.* 351, 96 *N. E.* 736, 38 *L. R. A., N. S.*, 204. Under the common law the rights of the plaintiff were not violated by the acts of the defendants." (111 *N. E.* at *page* 830)

In *Marrone v. Washington Jockey Club, supra* [227 *U. S.* 633, 33 *S. Ct.* 402], the plaintiff Joseph Marrone had been excluded from the Bennings Race Track on the charge that he had doped or drugged a horse. He brought an action for trespass for forcibly preventing him from entering the track and turning him out after he had bought an admission ticket and had dropped his ticket into the box. The District Court for the District of Columbia entered judgment against the plaintiff and this was affirmed on appeal by the Court of Appeals and the United States Supreme Court. In its opinion by Justice Holmes, the Supreme Court stated that it saw no reason for declining to follow the commonly accepted rule of *Leadbitter*; that the plaintiff's ticket gave him no "right *in rem*" and "no right to enforce specific performance by self help"; and "that his only right was to sue upon the contract for the breach." The Supreme Court did not discuss any of the pertinent policy considerations; if it had it would, under the facts presented to it (which may rightly be contrasted with the much more persuasive circumstances presented by the plaintiffs in the *Shubert* cases), presumably have reached the same result. The defendant was in the position to assert more than the traditional common-law right of the private entrepreneur to choose his patrons; its business admittedly tended to

attract many undesirables who could freely roam about its premises, and it was well-advised to be on the lookout for them and to bar them whenever possible. It would seem rather unwise to deter its cautionary efforts by judicial rulings placing heavy evidential burdens upon it or imposing tortious responsibility if perchance it acted mistakenly; in this connection the substantial interests of the defendant would appear to coincide with those of the public generally and to outweigh the comparatively slight interests of its patrons. See *Note*, 10 *Md. L. Rev.* 169, 184 (1949).

In *Madden v. Queens County Jockey Club, supra* [296 *N. Y.* 249, 72 *N. E.* 2d 699], the defendant excluded the plaintiff from its Aqueduct Race Track in the mistaken belief that he was Frank Costello's bookmaker. He thereupon sought a judicial declaration that he was entitled to enter the race track upon paying the required admission price; the New York Court of Appeals, citing *Marrone v. Washington Jockey Club, supra,* held that he was not entitled to any such declaration either at common law or under New York's Civil Rights Law. In the course of his opinion, Judge Fuld readily disposed of the plaintiff's contentions that the defendant's license to conduct pari-mutuel betting constituted it "an administrative agency of the State" and that its license "is a franchise to perform a public purpose." He soundly pointed out (1) that the defendant licensee was no more a state administrative agent than was the licensed cab driver, barber or liquor dealer, and (2) that the defendant's operation was not under a franchise for the performance of a public function but was under a license imposed for revenue and the regulation of a private business which, like the alcoholic beverage industry, entailed inherent dangers and was clearly affected with a public interest. See *Salmore v. Empire City Racing Ass'n.,* 123 *N. Y. S.* 2d 688, 692 (*Sup. Ct.* 1953), where the court noted that New York's "law permitting pari-mutuel betting was simply a revenue law enacted almost entirely for the purpose of raising money, with the improvement of the breed of horses a mere palliative cloak."

In *Greenfeld v. Maryland Jockey Club, supra,* the Maryland Court of Appeals, relying on the *Madden* case, affirmed the dismissal of the plaintiff's bill which sought (1) a declaratory decree that the plaintiff was entitled, upon payment of admission charges, to attend any race meetings conducted by the defendant, and (2) an injunction against interference with him "while in attendance as a spectator and bettor" at any race meeting. In his opinion for the court Judge Markell pointed out that racing was "a minutely regulated, heavily taxed business in which private rights and responsibility have not been wholly extinguished"; that the racing law had conferred "no personal right on individuals to attend or bet at race meetings"; and that, assuming the racing commission had power to do so, it had never adopted any regulation compelling the licensee "to admit all comers" as spectators and bettors unless excluded for good cause. In *Watkins v. Oaklawn Jockey Club, supra,* the court held that the exclusion of the plaintiff from the defendant's race track as an alleged undesirable did not constitute action of a state or a state administrative agency and did not deprive him of any rights or privileges guaranteed by the United States Constitution and the laws thereunder. In *Martin v. Monmouth Park Jockey Club, supra* [145 *F. Supp.* 440], the plaintiff was a jockey who had been suspended in Maryland because he had placed a bet on a horse running against the one he was riding. He was notified by the defendant that he would not be permitted to ride at the Monmouth Park race track and he sought injunctive relief from the United States District Court for the District of New Jersey. His complaint was dismissed in an opinion which stressed that the defendant, although intensely regulated, is still a private corporation which has the right, except as restricted by New Jersey's statutes relating to racial discrimination, "to admit or exclude any person as it pleases from its private property."

No holdings contrary to the foregoing have been cited by the plaintiff; and although he has urged that the defendant's common-law right of exclusion from its race

track should be limited because as a licensee "it has secured the advantage of a State monopoly," we find no force in his contention. See *Madden v. Queens County Jockey Club, supra; Greenfeld v. Maryland Jockey Club, supra*. The rules of the New Jersey Racing Commission say nothing about any individual patron's right to admission, but they do provide that the Association conducting the race meeting shall police its grounds and shall eject "persons believed to be bookmakers" along with other undesirables. (*Rule No. 22* (1958)) The rules contain general provisions for appeal to the Commission, but since they are not involved in this proceeding we need not pass upon their scope. The burden of the plaintiff's present attack is on the common-law doctrine which he states should be altered to afford to him a right of admission to the race track in the absence of affirmative legal proof by the defendant that there is good cause for his exclusion. We are satisfied that, without regard to views which may be entertained in other types of cases, there has been no showing made here for such alteration. The plaintiff's complaint states that the defendant advised him that he is not wanted at the race track and that his general record and reputation warrant his exclusion. It does not question the defendant's good faith or sound purpose nor does it present any countervailing circumstances or any urgent considerations of justice or policy which might move a court to depart from the many judicial decisions which have sustained the common-law right of race track operators to exclude suspected undesirables.

We come now to the plaintiff's alternative claim that under the provisions of the Civil Rights Act of New Jersey (*R. S.* 10:1–2 *et seq.*) the defendant has no right to exclude him from its race track. That statute was originally enacted in 1884 (*L.* 1884, *c.* 219, *p.* 339) and was modeled upon the earlier federal legislation dealt with in the *Civil Rights Cases* (*United States v. Stanley,* 109 *U. S.* 3, 3 *S. Ct.* 18, 27 *L. Ed.* 835, 1883). It provided, in section 1, that all persons in New Jersey shall be entitled to the full enjoyment of places of public accommodation and amusement,

"subject only to the conditions and limitations established by law, and applicable alike to citizens of every race and color, regardless of any previous condition of servitude," and in section 2 that persons who violated section 1 shall forfeit the sum of $500 to the aggrieved party and shall also be guilty of a misdemeanor. The statute was obviously aimed at discriminations based on color and race and left unimpaired the right of exclusion for unrelated reasons. See *Shubert v. Nixon Amusement Co., supra*, 83 *N. J. L.* at page 102; *Martin v. Monmouth Park Jockey Club, supra; Woollcott v. Shubert, supra; Finnesey v. Seattle Baseball Club, supra; Grannan v. Westchester Racing Ass'n*, 153 *N. Y.* 449, 47 *N. E.* 896 (*Ct. App.* 1897); *Turner and Kennedy, supra*, 32 *Iowa L. Rev.* at *pp.* 631, 637.

In 1917 the Civil Rights Act was amended to include a comprehensive definition of a "place of public accommodation, resort or amusement." *L.* 1917, *c.* 106, *p.* 220. In 1921 it was again amended to include additional places of public accommodation, resort or amusement and to prohibit the publication of advertisements indicating that accommodations would be denied to any person because of race, creed or color; although there were verbiage changes, the amendment contained nothing whatever to suggest any legislative purpose to enter the common-law field of exclusions for unrelated reasons. See *L.* 1921, *c.* 174, *p.* 468; *Woollcott v. Shubert, supra; Martin v. Monmouth Park Jockey Club, supra*. When the Civil Rights Act, as amended, was incorporated into the *Revision of* 1937, there were no changes of substance, and its paragraph separations in *R. S.* 10:1–2 *et seq.* were not intended to and did not alter the meaning and effect of the pre-existing legislation. See *Murphy v. Zink*, 136 *N. J. L.* 235, 244 (*Sup. Ct.* 1947), affirmed 136 *N. J. L.* 635 (*E. & A.* 1948); *Hartman v. City of Brigantine*, 42 *N. J. Super.* 247, 255 (*App. Div.* 1956), affirmed 23 *N. J.* 530 (1957).

In 1945 the Legislature broadened the language of the Civil Rights Act to refer expressly to discriminations based on national origin and ancestry as well as those based on

race, color and creed (*L.* 1945, *c.* 168, *p.* 587, *N. J. S. A.* 10:1–3, 6, 8); and in the same year it enacted the Law Against Discrimination which created the Division against Discrimination in the State Department of Education and empowered it to eliminate employment discriminations based on such reasons. *L.* 1945, *c.* 169, *p.* 589; *R. S.* 18:25–1 *et seq.* See also *L.* 1945, *cc.* 170–174, *N. J. S. A.* 10:1–10, 10:1–11, 10:2–1, 18:14–2, 30:9–17. In 1949 a bill was introduced which, according to its introducer's statement, was "intended to combine in one law the substantive provisions of the existing Civil Rights Law, *Revised Statutes,* 10:1–2 to 10:1–7, and the existing Law against discrimination, *Revised Statutes, sections* 18:25–1 to 18:25–28." See *Assembly* No. 65 (1949). This bill, as amended, became *L.* 1949, *c.* 11, *p.* 37, renamed the Division against Discrimination as the Commission on Civil Rights, and extended the scope of *L.* 1945, *c.* 169, to include discriminations in places of public accommodation and amusement based on race, creed, color, national origin or ancestry; it is clear from the terms of the statute that it did not in any wise bear upon the right of exclusion for other reasons.

All of the decisions which have dealt with the provisions of New Jersey's Civil Rights Act (*R. S.* 10:1–2 *et seq.; cf. R. S.* 18:25–1 *et seq.*), or with comparable provisions elsewhere, have held that they are inapplicable to exclusions which are wholly unrelated to race, creed, color, national origin or ancestry. See *Shubert v. Nixon Amusement Co., supra; Woollcott v. Shubert, supra; Martin v. Monmouth Park Jockey Club, supra; Finnesey v. Seattle Baseball Club, supra.* The California case cited by the plaintiff dealt with a local statute which provides that it shall be unlawful for the operator of a race course or other place of public amusement "to refuse admittance to any person over the age of twenty-one years," although any person "who is guilty of boisterous conduct, or any person of lewd or immoral character, may be excluded" (*Cal. Civil Code, sec.* 53). See *Orloff v. Los Angeles Turf Club,* 30 *Cal.* 2d 110, 180 *P.* 2d 321, 171 *A. L. R.* 913 (*Sup. Ct.* 1947). *Cf. Orloff v.*

*Los Angeles Turf Club*, 36 *Cal. 2d* 734, 227 *P. 2d* 449 (*Sup. Ct.* 1951); *Orloff v. Hollywood Turf Club,* 110 *Cal. App. 2d* 340, 242 *P. 2d* 660 (*D. Ct. App.* 1952). The New Jersey Legislature has not seen fit to adopt any similar statutory provision, and consequently the decisions construing the California statute. can have no effect here. Since the plaintiff does not suggest that his exclusion was based on race, creed, color, national origin or ancestry we find the Civil Rights Act to be inapplicable.

The judgment entered in the Chancery Division is in all respects:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.