KENNETH S. USTON, RESPONDENT, v. RESORTS INTERNATIONAL HOTEL, INC., APPELLANT, AND NEW JERSEY CASINO CONTROL COMMISSION, INTERVENOR-APPELLANT, AND ATLANTIC CITY CASINO HOTEL ASSOCIATION, INTERVENOR-APPELLANT.

Argued February 9, 1982—Decided May 5, 1982.

*Joel H. Sterns* argued the cause for appellant Resorts International Hotel, Inc. (*Sterns, Herbert & Weinroth,* attorneys; *John M. Donnelly,* on the briefs).

*Matthew P. Boylan* argued the cause for appellant Atlantic City Casino Hotel Association (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan,* attorneys; *Clive S. Cummis, Morris Brown, Nicholas L. Rubis, Alfred J. Luciani, John Walker Daniels, David M. Satz, Jr., Martin L. Blatt* and *Charles C. Carella,* of counsel).

*Michael A. Santaniello,* Senior Assistant Counsel, argued the cause for appellant New Jersey Casino Control Commission (*Robert J. Genatt,* General Counsel, attorney; *Robert J. Genatt, R. Benjamin Cohen* and *Michael A. Santaniello,* of counsel; *R. Benjamin Cohen, Anthony J. Sposaro* and *Michael A. Santaniello,* on the briefs).

*Morris M. Goldings,* a member of the Massachusetts bar, and *Kenneth F. Hense* argued the cause for respondent (*Reed & Hense,* attorneys; *Morris M. Goldings* and *H. Glenn Alberich,* members of the Massachusetts bar, of counsel; *Kenneth F. Hense,* on the brief).

*Irwin I. Kimmelman,* Attorney General of New Jersey, argued the cause for *amicus curiae* Department of Law and Public Safety, Division of Gaming Enforcement (*Irwin I. Kimmelman,* attorney; *Anthony J. Parrillo,* Deputy Attorney General, of counsel; *Stephen C. Becker* and *Mary L. Cupo,* Deputy Attorneys General, on the brief).

*John Walker Daniels* submitted a letter in lieu of a brief on behalf of *amicus curiae* Harrah's Marina Hotel Casino (*Horn, Kaplan, Goldberg & Gorny,* attorneys; *Philip G. Satre,* a member of the Nevada bar, of counsel).

The opinion of the Court was delivered by

PASHMAN, J.

Since January 30, 1979, appellant Resorts International Hotel, Inc. (Resorts) has excluded respondent, Kenneth Uston, from the

blackjack tables in its casino because Uston's strategy increases his chances of winning money. Uston concedes that his strategy of card counting can tilt the odds in his favor under the current blackjack rules promulgated by the Casino Control Commission (Commission). However, Uston contends that Resorts has no common law or statutory right to exclude him because of his strategy for playing blackjack.

We hold that the Casino Control Act, *N.J.S.A.* 5:12–1 to –152 gives the Commission exclusive authority to set the rules of licensed casino games, which includes the methods for playing those games. The Casino Control Act therefore precludes Resorts from excluding Uston for card counting. Because the Commission has not exercised its exclusive authority to determine whether card counters should be excluded, we do not decide whether such an exclusion would be lawful.

## I

Kenneth Uston is a renowned teacher and practitioner of a complex strategy for playing blackjack known as card counting.[1] Card counters keep track of the playing cards as they are dealt and adjust their betting patterns when the odds are in their favor. When used over a period of time, this method allegedly ensures a profitable encounter with the casino.

Uston first played blackjack at Resorts' casino in November 1978. Resorts took no steps to bar Uston at that time, apparently because the Commission's blackjack rules then in operation minimized the advantages of card counting.

On January 5, 1979, however, a new Commission rule took effect that dramatically improved the card counter's odds. *N.J. A.C.* 19:47–2.5. The new rule, which remains in effect, restrict-

---

[1] Uston has described his strategy and his alleged success at Atlantic City blackjack tables on broadcast media and in books. *See* Uston, *Two Books on Blackjack.*

ed the reshuffling of the deck in ways that benefitted card counters. Resorts concedes that the Commission could promulgate blackjack rules that virtually eliminate the advantage of card counting. However, such rules would slow the game, diminishing the casino's "take" and consequently its profits from blackjack gaming.

By letter dated January 30, 1979, attorneys for Resorts wrote to Commission Chairman Lordi, asking the Commission's position on the legality of summarily removing card counters from its blackjack tables. That same day, Commissioner Lordi responded in writing that no statute or regulation barred Resorts from excluding professional card counters from its casino. Before the day had ended, Resorts terminated Uston's career at its blackjack tables, on the basis that in its opinion he was a professional card counter. Resorts subsequently formulated standards for identification of card counters and adopted a general policy to exclude such players.[2]

The Commission upheld Resorts' decision to exclude Uston. Relying on *Garifine v. Monmouth Park Jockey Club*, 29 *N.J.* 47 (1959), the Commission held that Resorts enjoys a common law right to exclude anyone it chooses, as long as the exclusion does not violate state and federal civil rights laws. The Appellate Division reversed, 179 *N.J.Super.* 223 (1981). Although we interpret the Casino Control Act, *N.J.S.A.* 5:12–1 to –152 somewhat differently than did the Appellate Division, we affirm that court's holding that the Casino Control Act precludes Resorts from excluding Uston. The Commission alone has the authority to exclude patrons based upon their strategies for playing licensed casino games. Any common law right Resorts may have had to exclude Uston for these reasons is abrogated by the act. We therefore need not decide the precise extent of Resorts'

---

[2]Since then an industry-wide policy has developed to ban card counters. Each casino maintains its own list of persons to be barred as card counters.

common law right to exclude patrons for reasons not covered by the act. Nonetheless, we feel constrained to refute any implication arising from the Commission's opinion that absent supervening statutes, the owners of places open to the public enjoy an absolute right to exclude patrons without good cause. We hold that the common law right to exclude is substantially limited by a competing common law right of reasonable access to public places.

## II

This Court has recognized that "[t]he statutory and administrative controls over casino operations established by the [Casino Control] Act are extraordinarily pervasive and intensive." *Knight v. Margate*, 86 *N.J.* 374, 380–81 (1981). The almost 200 separate statutory provisions "cover virtually every facet of casino gambling and its potential impact upon the public." *Id.* at 381. *See Bally Mfg. Corp. v. N. J. Casino Control Comm'n*, 85 *N.J.* 325 (1981) (upholding Commission regulation barring a licensed casino from acquiring more than 50% of its slot machines from any one manufacturer). These provisions include a preemption clause, stating that the act prevails over "any other provision of law" in conflict or inconsistent with its provisions. *N.J.S.A.* 5:12–133(b). Moreover, the act declares as public policy of this State "that the institution of licensed casino establishments in New Jersey be strictly regulated and controlled." *N.J.S.A.* 5:12–1(13).

At the heart of the Casino Control Act are its provisions for the regulation of licensed casino games. *N.J.S.A.* 5:12–100 provides:

... e. All gaming shall be conducted according to rules promulgated by the commission. All wagers and pay-offs of winning wagers at table games shall be made according to rules promulgated by the commission, which shall establish such minimum wagers and other limitations as may be necessary to assure the vitality of casino operations and fair odds to and maximum participation by casino patrons; ....

This provision on games and gaming equipment reinforces the general statutory provisions codified at *N.J.S.A.* 5:12–70. Those provisions provide in part:

> The Commission shall, without limitation on the powers conferred in the preceding section, include within its regulations the following specific provisions in accordance with the provisions of the act;
>
> \* \* \* \* \* \* \* \*
>
> f. Defining and limiting the areas of operation, the rules of authorized games, odds, and devices permitted, and the method of operation of such games and devices; . . . .

Pursuant to these statutes, the Commission has promulgated exhaustive rules on the playing of blackjack. *N.J.A.C.* 19:47–2.1 to –2.13. These rules cover every conceivable aspect of the game, from determining how the cards are to be shuffled and cut, *N.J.A.C.* 19:47–2.5, to providing that certain cards shall not be dealt "until the dealer has first announced 'Dealer's Card' which shall be stated by the dealer in a tone of voice calculated to be heard by each person at the table." *N.J.A.C.* 19:47–2.6(g). It is no exaggeration to state that the Commission's regulation of blackjack is more extensive than the entire administrative regulation of many industries.

These exhaustive statutes and regulations make clear that the Commission's control over the rules and conduct of licensed casino games is intended to be comprehensive. The ability of casino operators to determine how the games will be played would undermine this control and subvert the important policy of ensuring the "credibility and integrity of the regulatory process and of casino operations." *N.J.S.A.* 5:12–1(b). The Commission has promulgated the blackjack rules that give Uston a comparative advantage, and it has sole authority to change those rules. There is no indication that Uston has violated any Commission rule on the playing of blackjack. *N.J. A.C.* 19:47–2.1 to –2.13. Put simply, Uston's gaming is "conducted according to rules promulgated by the Commission." *N.J.S.A.* 5:12–100(e). Resorts has no right to exclude Uston on

grounds that he successfully plays the game under existing rules.[3]

### III

Resorts claimed that it could exclude Uston because it had a common law right to exclude anyone at all for any reason. While we hold that the Casino Control Act precludes Resorts from excluding Uston for the reasons stated, it is important for us to address the asserted common law right for two reasons. First, Resorts' contentions and the Commission's position concerning the common law right are incorrect. Second, the act has not completely divested Resorts of its common law right to exclude.

The right of an amusement place owner to exclude unwanted patrons and the patron's competing right of reasonable access both have deep roots in the common law. *See* Arterburn, "The Origin and First Test of Public Callings," 75 *U.Pa.L.Rev.* 411 (1927); Wyman, "The Law of Public Callings as a Solution of the Trust Problem," 17 *Harv.L.Rev.* 156 (1904). In this century, however, courts have disregarded the right of reasonable access in the common law of some jurisdictions at the time the Civil War Amendments and Civil Rights Act of 1866 were passed.

---

[3]The Appellate Division relied on *N.J.S.A.* 5:12–71 (§ 71) to establish the Commission's right to exclude Uston. That provision directs the Commission to compile a list of persons to be excluded from gaming casinos whose presence in the casino would be inimical to the interests of casino gambling in New Jersey. *N.J.S.A.* 5:12–71(a)(3). The section applies to persons whose backgrounds or occupations indicate either criminal activity or actions hostile to the integrity of licensed casino gambling. We do not rely on this portion of the statute.

The Attorney General interpreted § 71 to be a tightly circumscribed intrusion on common law rights. We need not determine whether § 71, standing alone, would give the Commission the authority to exclude card counters. *Cf. Uston v. Hilton Hotels Corp.*, 448 *F.Supp.* 116 (D.Nev.1978) (interpreting Nevada statute virtually identical to § 71 as having no bearing on whether card-counters can be excluded from casinos).

As Justice Goldberg noted in his concurrence in *Bell v. Maryland*, 378 *U.S.* 226, 84 *S.Ct.* 1814, 12 *L.Ed.2d* 822 (1964):

Underlying the congressional discussions and at the heart of the Fourteenth Amendment's guarantee of equal protection, was the assumption that the State by statute or by "the good old common law" was obligated to guarantee all citizens access to places of public accommodation. [378 *U.S.* at 296, 84 *S.Ct.* at 1852, 12 *L.Ed.2d* at 839, Goldberg, J., joined by Warren, C. J. and Douglas, J., concurring]

*See, e.g., Ferguson v. Gies*, 82 *Mich.* 358, 46 *N.W.* 718 (1890) (after passage of the Fourteenth Amendment, both the civil rights statutes and the common law provided grounds for a non-white plaintiff to recover damages from a restaurant owner's refusal to serve him, because the common law as it existed before passage of the civil rights laws "gave to the white man a remedy against any unjust discrimination to the citizen in all public places"); *Donnell v. State*, 48 *Miss.* 661 (1873) (state's common law includes a right of reasonable access to all public places).

The current majority American rule has for many years disregarded the right of reasonable access,[4] granting to proprietors of amusement places an absolute right arbitrarily to eject or exclude any person consistent with state and federal civil rights laws. *See* Annot., "Propriety of exclusion of persons from horseracing tracks for reasons other than color or race," 90 *A.L.R.3d* 1361 (1979); Turner & Kennedy, "Exclusion, Ejection and Segregation of Theater Patrons," 32 *Iowa L.Rev.* 625 (1947). *See also Garifine v. Monmouth Park Jockey Club*, 29 *N.J.* at 50.

At one time, an absolute right of exclusion prevailed in this state, though more for reasons of deference to the noted English precedent of *Wood v. Leadbitter*, 13 *M&W* 838, 153 *Eng.Rep.* 351, (Ex.1845), than for reasons of policy. In *Shubert v. Nixon*

---

[4]The denial of freedom of reasonable access in some States following passage of the Fourteenth Amendment, and the creation of a common law freedom to arbitrarily exclude following invalidation of segregation statutes, suggest that the current majority rule may have had less than dignified origins. *See Bell v. Maryland, supra.*

*Amusement Co.*, 83 *N.J.L.* 101 (Sup.Ct.1912), the former Supreme Court dismissed a suit for damages resulting from plaintiff's ejection from defendants' theater. Noting that plaintiff made no allegation of exclusion on the basis of race, color or previous condition of servitude, the Court concluded:

> In view of the substantially uniform approval of, and reliance on, the decision in *Wood v. Leadbitter* in our state adjudications, it must fairly be considered to be adopted as part of our jurisprudence, and whatever views may be entertained as to the natural justice or injustice of ejecting a theater patron without reason after he has paid for his ticket and taken his seat, we feel constrained to follow that decision as the settled law. [83 *N.J.L.* at 106]

It hardly bears mention that our common law has evolved in the intervening 70 years. In fact, *Leadbitter* itself was disapproved three years after the *Shubert* decision by *Hurst v. Picture Theatres Limited*, (1915) 1 *K.B.* 1 (1914). Of far greater importance, the decisions of this Court have recognized that "the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property." *State v. Schmid*, 84 *N.J.* 535, 562 (1980).

*State v. Schmid* involved the constitutional right to distribute literature on a private university campus. The Court's approach in that case balanced individual rights against property rights. It is therefore analogous to a description of the common law right of exclusion. Balancing the university's interest in controlling its property against plaintiff's interest in access to that property to express his views, the Court clearly refused to protect unreasonable exclusions. Justice Handler noted that

> Regulations ... devoid of reasonable standards designed to protect both the legitimate interests of the University as an institution of higher education and the individual exercise of expressional freedom cannot constitutionally be invoked to prohibit the otherwise noninjurious and reasonable exercise of [First Amendment] freedoms." [*Id.* at 567]

In *State v. Shack*, 58 *N.J.* 297 (1971), the Court held that although an employer of migrant farm workers "may reasonably require" those visiting his employees to identify themselves, "the employer may not deny the worker his privacy or interfere

with his opportunity to live with dignity and to enjoy associations customary among our citizens." *Id.* at 308. The Court reversed the trespass convictions of an attorney and a social services worker who had entered the property to assist farmworkers there.

*Schmid* recognizes implicitly that when property owners open their premises to the general public in the pursuit of their own property interests, they have no right to exclude people unreasonably. On the contrary, they have a duty not to act in an arbitrary or discriminatory manner toward persons who come on their premises. That duty applies not only to common carriers, *Messenger v. Pennsylvania Railroad Co.*, 37 *N.J.L.* 531 (E. & A. 1874), innkeepers, *see Garifine, supra*, owners of gasoline service stations, *Streeter v. Brogan*, 113 *N.J.Super.* 486 (Ch.Div.1971), or to private hospitals, *Doe v. Bridgeton Hospital Ass'n, Inc.*, 71 *N.J.* 478 (1976), *cert. den.*, 433 *U.S.* 914, 97 *S.Ct.* 2987, 53 *L.Ed.2d* 1100 (1977), but to all property owners who open their premises to the public. Property owners have no legitimate interest in unreasonably excluding particular members of the public when they open their premises for public use.

No party in this appeal questions the right of property owners to exclude from their premises those whose actions "disrupt the regular and essential operations of the [premises]," *State v. Schmid*, 84 *N.J.* at 566 (quoting Princeton University Regulations on solicitation), or threaten the security of the premises and its occupants, *see State v. Shack*, 58 *N.J.* at 308. In some circumstances, proprietors have a duty to remove disorderly or otherwise dangerous persons from the premises. *See Holly v. Meyers Hotel and Tavern, Inc.*, 9 *N.J.* 493, 495 (1952). These common law principles enable the casino to bar from its entire facility, for instance, the disorderly, the intoxicated, and the repetitive petty offender.

Whether a decision to exclude is reasonable must be determined from the facts of each case.[5] Respondent Uston does not threaten the security of any casino occupant. Nor has he disrupted the functioning of any casino operations. Absent a valid contrary rule by the Commission, Uston possesses the usual right of reasonable access to Resorts International's blackjack tables.

## IV

Although the Commission alone has authority to exclude persons based upon their methods of playing licensed casino games, that authority has constitutional and statutory limits. We expressly decline to decide whether the Casino Control Act empowers the Commission to exclude card counters.

If the Commission decides to consider promulgating a rule banning card counters, it should review the statutory mandates regarding both the public policy of this State and the rules of licensed games. The Casino Control Act commands the Commission to regulate gambling with such "limitations as may be necessary *to assure the vitality of casino operations and fair odds to and maximum participation by casino patrons," N.J.S.A.* 5:12–100(e) (emphasis added). The Court recognizes that the goals of casino vitality, fair odds to all players and maximum player participation may be in conflict. It is the Commission which must strike the appropriate balance.

The Commission should also consider that the Legislature has declared as public policy of this state that "[c]onfidence in casino gaming operations is eroded to the extent the State of New Jersey does not provide a regulatory framework for casino gaming that permits and promotes stability and continuity in

---

[5]We need not decide whether the common law allows exclusion of those merely suspected of criminal activity, *see Garifine, supra*, 29 *N.J.* at 57, because the Casino Control Act clearly vests such decisions in the Commission alone. *N.J.S.A.* 5:12–71.

casino gaming operations." *N.J.S.A.* 5:12–1(14). Moreover, "[a]n integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." *N.J.S.A.* 5:12–1(6). The exclusion of persons who can play the licensed games to their advantage may diminish public confidence in the fairness of casino gaming. To the extent persons not counting cards would be mistakenly excluded, public confidence might be further diminished. However, the right of the casinos to have the rules drawn so as to allow some reasonable profit must also be recognized in any realistic assessment. The Commission should consider the potentially broad ramifications of excluding card counters before it seeks to promulgate such a rule. Fairness and the integrity of casino gaming are the touchstones.

## V

In sum, absent a valid Commission regulation excluding card counters, respondent Uston will be free to employ his card-counting strategy at Resorts' blackjack tables. There is currently no Commission rule banning Uston, and Resorts has no authority to exclude him for card counting. However, it is not clear whether the Commission would have adopted regulations involving card counters had it known that Resorts could not exclude Uston. The Court therefore continues the temporary order banning Uston from Resorts' blackjack tables for 90 days from the date of this opinion. After that time, respondent is free to play blackjack at Resorts' casino absent a valid Commission rule excluding him.

*For affirmance*—Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER and O'HERN—5.

*For reversal*—None.