186 N.J. Super. 483 (1982)
453 A.2d 228
JOHN MARZOCCA, PLAINTIFF-APPELLANT,
v.
FRANK FERRONE, FREEHOLD RACEWAY AND NEW JERSEY RACING COMMISSION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 8, 1982.
Decided July 29, 1982.
*485 Before Judges MICHELS, McELROY and J.H. COLEMAN.
Donald M. Lomurro argued the cause for appellant (Lomurro & Eastman, attorneys).
Fredric M. Knapp, Deputy Attorney General, argued the cause for respondent New Jersey Racing Commission (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
*486 Robert S. Raymar, argued the cause for respondent Ferrone and Freehold Racing Association (Hellring, Lindeman, Goldstein & Siegal, attorneys; Bernard Hellring and Robert S. Raymar, on the brief).
The opinion of the court was delivered by McELROY, J.A.D.
These consolidated appeals raise the issue of whether defendant Freehold Raceway Association (FRA) and its racing secretary, defendant, Frank Ferrone, possess the unlimited right, for asserted business reasons, to bar Lord John C, a standard-bred horse owned by plaintiff-appellant John Marzocca, from racing at FRA's track.
The relevant facts follow. After racing his horse at Freehold Raceway in three successful and successive races Marzocca, on May 8, 1981, instructed his trainer to remove Lord John C from that race meeting and enter him at Yonkers Raceway in New York. The reason for this removal was the hope of winning larger purses than those available to this horse at Freehold. When plaintiff's trainer informed FRA's racing secretary of this decision, Ferrone advised the trainer that if the horse were removed at that time it would never be permitted to race at the Freehold facility again. Marzocca, nevertheless, removed the horse and entered it at Yonkers. True to his word, Ferrone refused to permit Lord John C to race at Freehold when Marzocca twice attempted to enter the horse in July 1981. Another standard-bred owned by Marzocca, Olympic Charley, was accepted by Ferrone and permitted to race.
The certification filed by Ferrone gives the reasons for barring Lord John C. Ferrone has a duty to his employer to establish daily programs. Part of that task requires him to have available a sufficient number of horses in a given class to attract significant betting, thus ensuring profitability to the track and revenue to the State. If there are fewer than six horses in a race, and particularly if late scratches develop, there is a "short *487 field." Such a race depresses betting and the track may face the possibility of a minus pool, requiring the FRA to pay out more than was wagered. Moreover, a track needs committed sound horses so that races may be drawn up in advance as to type of race and size of purse. Lord John C "developed in the spring of 1981 into a good $15,000 class horse" and in this class Ferrone "consistently had extreme difficulty filling races." He regarded Marzocca's transfer of Lord John C, without advance notice, as a discourtesy and a selfish action that threatened the interests of other horse owners and the track. Ferrone's attempt to persuade the trainer to race at Freehold for one or two further weeks was rebuffed. It is clear that Ferrone's refusal to permit Lord John C to race was not pursuant to any state rule or regulation. The record is silent as to whether this action was taken pursuant to any internal rule of FRA in force and known to horse owners prior to the race meeting being held in May 1981.
We take notice that FRA operates a private track in Freehold, New Jersey, and is given quasi-monopolistic protection. N.J.S.A. 5:5-45 and 5:5-46; N.J.A.C. 13:70-3.1. During some months it is the only track in this State scheduling races for standard-bred horses. During other months its season may conflict with harness racing at the Meadowlands Raceway or the track at Atlantic City. Freehold is subject to statutory and administrative regulations. See N.J.A.C. 13:70-1.1 et seq. There are state employees present at the track on a full-time basis, including New Jersey State Police (see N.J.A.C. 13:70-1.27), state stewards and a state veterinarian. See N.J.S.A. 5:5-37. All owners, drivers, jockeys and trainers must be licensed by the New Jersey Racing Commission (NJRC) before they can race on a New Jersey track. N.J.A.C. 13:70-4.1, N.J.A.C. 13:70-9.1.
When plaintiff was denied the right to race Lord John C at Freehold Raceway he responded by filing a verified complaint in the Chancery Division, seeking a restraining order against FRA, Ferrone and the New Jersey Racing Commission. On July 27, *488 1981 the court signed an order to show cause returnable August 3, 1981. The hearing was held on August 4, 1981 after FRA and Ferrone filed a motion to dismiss the complaint as failing to state a claim upon which relief can be granted. On that date the court granted defendants' motion.[1] An order was entered September 16, 1981 dismissing the verified complaint and discharging the order to show cause "for lack of subject matter jurisdiction in this court and for failure of the plaintiff to state a claim upon which relief can be granted."[2] Appeal number A-5579-80T2 is from this order and will be addressed as appeal number one.
Appeal number A-5580-80T2, hereafter addressed as appeal number two, comes to us in the following fashion. On August 5, 1981, without notice to defendants FRA and Ferrone, plaintiff by letter demanded a hearing before the New Jersey Racing Commission. In a letter dated August 11, 1981 the Commission, through its counsel, refused plaintiff a hearing. The NJRC letter stated, in part:
Our review of the factual basis of your dispute reveals that it concerns a purely business related decision of the Freehold Raceway and its racing secretary. Although the raceway is a permit holder licensed by the Commission, the composition of the racing card is a matter left entirely to the discretion of the permit holder. Hence, there is no contested case pursuant to N.J.S.A. 52:14B-2(b) which the Commission would have jurisdiction to hear. Further, N.J.S.A. 52:14B-9 only requires a hearing in contested cases. Since there is no contested case, no hearing is required and none will be held.
The foregoing substantially reflects the position of NJRC on this consolidated appeal. With respect to appeal number two, *489 FRA and Ferrone contend that they are not proper parties because they were not given notice of plaintiff's request for an NJRC hearing and did not participate in the denial of plaintiff's request for a hearing.

I. Appeal Number One

FRA and Ferrone contend that in these circumstances they have an unlimited common law right to bar plaintiff's horse, Lord John C, from racing at their track. These defendants assert that "the courts of this and other states  and the federal courts  have consistently and repeatedly emphasized the common law right of racing facilities to exclude or eject horses, horsemen and patrons." Defendants allege that this right "is unlimited, and the facility's discretion is absolute." They primarily defend this position by standing behind the bulwarks of Garifine v. Monmouth Park Jockey Club, 29 N.J. 47 (1959), and Martin v. Monmouth Park Jockey Club, 145 F. Supp. 439 (D.N.J. 1956), aff'd 242 F.2d 344 (3 Cir.1957). These cases, and many others, proclaimed the common right of a private racing enterprise to exclude a patron (Garifine) or a person licensed to make use of the racing facility, such as the horse owner here involved, or a licensed jockey (Martin), because such places of amusement (unlike ventures having a public calling, i.e., inns or common carriers) were not viewed in law as businesses burdened, for public policy reasons, with a duty to unconditionally serve the public and others utilizing the business facility. Garifine, 29 N.J. at 50-51. We agree with defendants FRA and Ferrone that the reasons underlying the common law right of exclusion of patrons apply equally to the right to exclude a horse owner, his horse, a jockey or any individual who seeks to earn his living at the private business facility. The principle, as previously noted, was applied in Martin v. Monmouth Park Jockey Club, supra, to a jockey. See, also, the discussion of the application of the exclusionary principle in relation to a horse owner by the court in Jacobson v. New York Racing Ass'n, Inc., 33 N.Y.2d 144, 149, 350 N.Y.S.2d 639, 642, 305 N.E.2d 765, 767-768 (Ct.App. 1973).
*490 Until very recently private enterprises, even those generally open to the public, were regarded in this State as enjoying the absolute common law right, here asserted, to arbitrarily exclude or eject any person where such action did not violate state and federal civil rights laws or constitutional considerations. Lately, however, a decision by our Supreme Court has severely affected that common law principle. Uston v. Resorts Int'l Hotel, Inc., 89 N.J. 163 (1982). That case graphically illustrates the court's departure from the apparent reiteration of the absolute exclusionary rule in Garifine v. Monmouth Park Jockey Club, supra.[3]
In Uston the court held that the stringent regulations of the Casino Control Act precluded defendant casino from excluding plaintiff, a skilled "card counter" from its blackjack tables by promulgating a private rule of exclusion. Having so held the *491 court nevertheless found itself obliged to meet the casino's further contention that it had "a common law right to exclude anyone for any reason." It did so because it viewed the casino's position "concerning the common law right [as] incorrect" and because it regarded the Casino Control Act as not completely divesting the defendant casino of its common law right to exclude whomever it wished to bar from its premises. Id. at 170. In so doing, the court reviewed its recent and analogous decisions in State v. Shack, 58 N.J. 297 (1971), and State v. Schmid, 84 N.J. 535 (1980), app. dism. as moot sub nom, Princeton Univ. v. Schmid, ___ U.S. ___, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), and declared that "[p]roperty owners have no legitimate interest in unreasonably excluding particular members of the public [and, inferentially, those otherwise entitled to use the public facilities] when they open their premises for public use." Id. 89 N.J. at 173. Much of the Uston opinion bears repeating here (footnotes are omitted):
The current majority American rule has for many years disregarded the right of reasonable access, granting to proprietors of amusement places an absolute right arbitrarily to eject or exclude any person consistent with state and federal civil rights laws. See Annot., `Propriety of exclusion of persons from horseracing tracks for reasons other than color or race,' 90 A.L.R.3d 1361 (1979); Turner & Kennedy, `Exclusion, Ejection and Segregation of Theater Patrons,' 32 Iowa L.Rev. 625 (1947). See also Garifine v. Monmouth Park Jockey Club, 29 N.J. at 50.
At one time, an absolute right of exclusion prevailed in this state, though more for reasons of deference to the noted English precedent of Wood v. Leadbitter, 13 M & W 838, 153 Eng.Rep. 351, (Ex. 1845), than for reasons of policy. In Shubert v. Nixon Amusement Co., 83 N.J.L. 101 (Sup.Ct. 1912), the former Supreme Court dismissed a suit for damages resulting from plaintiff's ejection from defendants' theater. Noting that plaintiff made no allegation of exclusion on the basis of race, color or previous condition of servitude, the Court concluded:
"In view of the substantially uniform approval of, and reliance on, the decision in Wood v. Leadbitter in our state adjudications, it must fairly be considered to be adopted as part of our jurisprudence, and whatever views may be entertained as to the natural justice or injustice of ejecting a theater patron without reason after he has paid for his ticket and taken his seat, we feel constrained to follow that decision as the settled law. [83 N.J.L. at 106]" It hardly bears mention that our common law has evolved in the intervening
70 years. In fact, Leadbitter itself was disapproved three years after the *492 Shubert decision by Hurst v. Pictures Theatres Limited, (1915) 1 K.B. 1 (1914). Of far greater importance, the decisions of this Court have recognized that "the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property." State v. Schmid, 84 N.J. 535, 562 (1980).

State v. Schmid involved the constitutional right to distribute literature on a private university campus. The Court's approach in that case balanced individual rights against property rights. It is therefore analogous to a description of the common law right of exclusion. Balancing the university's interest in controlling its property against plaintiff's interest in access to that property to express his views, the Court clearly refused to protect unreasonable exclusions. Justice Handler noted that
"Regulations ... devoid of reasonable standards designed to protect both the legitimate interests of the University as an institution of higher education and the individual exercise of expressional freedom cannot constitutionally be invoked to prohibit the otherwise noninjurious and reasonable exercise of [First Amendment] freedoms. [Id. at 567]"
In State v. Shack, 58 N.J. 297 (1971), the Court held that although an employer of migrant farm workers "may reasonably require" those visiting his employees to identify themselves, "the employer may not deny the worker his privacy or interfere with his opportunity to live with dignity and to enjoy associations customary among our citizens." Id. at 308. The Court reversed the trespass convictions of an attorney and a social services worker who had entered the property to assist farmworkers there.

Schmid recognizes implicitly that when property owners open their premises to the general public in the pursuit of their own property interests, they have no right to exclude people unreasonably. On the contrary, they have a duty not to act in an arbitrary or discriminatory manner toward persons who come on their premises. That duty applies not only to common carriers, Messenger v. Pennsylvania Railroad Co., 37 N.J.L. 531 (E. & A. 1874), innkeepers, see Garifine, supra, owners of gasoline service stations, Streeter v. Brogan, 113 N.J. Super. 486 (Ch. Div. 1971), or to private hospitals Doe v. Bridgeton Hospital Ass'n, Inc., 71 N.J. 478 (1976), cert. den., 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977), but to all property owners who open their premises to the public. Property owners have no legitimate interest in unreasonably excluding particular members of the public when they open their premises for public use.

No party in this appeal questions the right of property owners to exclude from their premises those whose actions `disrupt the regular and essential operations of the [premises],' State v. Schmid, 84 N.J. at 566 (quoting Princeton University Regulations on solicitation), or threaten the security of the premises and its occupants, see State v. Shack, 58 N.J. at 308. In some circumstances, proprietors have a duty to remove disorderly or otherwise dangerous persons from the premises. See Holly v. Meyers Hotel and Tavern, Inc., 9 N.J. 493, 495 (1952). These common law principles enable the casino to bar from its entire facility, for instance, the disorderly, the intoxicated, and the repetitive petty offender.
Whether a decision to exclude is reasonable must be determined from the facts of each case. Respondent Ulston does not threaten the security of any casino *493 occupant. Nor has he disrupted the functioning of any casino operations. Absent a valid contrary rule by the Commission, Uston possesses the usual right of reasonable access to Resorts International's blackjack tables. [Id. at 171-174; emphasis supplied]
It should be observed that State v. Schmid, 84 N.J. 535 (1980), relied on in Uston, involved the fundamental right of freedom of speech and assembly under the New Jersey Constitution weighed against a proprietor's legitimate interests in private property. Id. at 560.[4]Uston did not involve a state constitutional question and its decision is solely based upon a modification of the common law exclusionary rule, using Schmid and State v. Shack by way of analogy to invoke a reasonable rule of exclusion to be determined on the facts of each case. Id. 89 N.J. at 171-174. The ultimate decision as to that which is reasonable involves, as Uston implies and Schmid holds, application of a balancing test that weighs the private proprietor's property right against the horse owner's common law right to pursue his state licensed and lawful business of racing his horse without unlawful and unreasonable hindrance. The latter right is well settled as a common law right quite apart from constitutional imprimatur. Brennan v. United Hatters, 73 N.J.L. 729 (E. & A. 1906). In Brennan Justice Pitney observed:
The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellowmen, saving such as may result from the exercise of equal or superior rights on their part  such, for instance, as the right of fair competition in the *494 like field of human effort  and saving, of course, such other hindrance or obstruction as may be legally excused or justified. [at 742]
Both parties thus have rights which should be judicially protected. In the balancing process account must be taken of FRA's private property rights and the nature, purposes and primary use of the private property. In this case the fact that for some portion of the year FRA, by state grant, operates the only standardbred racing facility in this State has some bearing. We do not imply that FRA's temporal monopoly is a factor so heavily weighted as to be solely decisive. Such an approach was rejected in Garifine, supra, 29 N.J. at 57, and we are bound by that determination. It is nevertheless, a consideration going to the question of the reasonableness of FRA's action here and one to be weighted with those that follow. Also to be considered is the nature and scope of the invitation extended by FRA to horse owners to utilize the track facilities. Part of this factor is whether the "rule" here invoked was one commonly acknowledged by FRA and horse owners prior to its enforcement either because it was an oral or written rule or a matter of common understanding in the racing community. Here we note that, subject to any rules promulgated by the NJRC in the first instance, FRA is required by statute and regulation to adhere to the rules and regulations of the United States Trotting Association, N.J.S.A. 5:5-30; N.J.A.C. 13:71-1.1. The record is silent as to whether any rules of the Trotting Association are implicated here. Equally to be weighed is plaintiff's common law right to pursue a livelihood by using his horse for racing when and where he may reasonably choose to do so subject only to "hindrance or obstruction as may be legally excused or justified." Brennan, supra, 73 N.J.L. at 742.
We do not in the foregoing general outline of matters to be considered intend to be restrictive as to factors that may bear upon resolution of the issue and should therefore be thrown into the balancing process. The record before us consists of affidavits drawn prior to the Supreme Court's decision in Uston. A full hearing is required and in that process the parties by reason *495 of their greater familiarity with racing problems may develop other facts to be considered in resolving the question of whether the restriction here imposed by FRA is, in the circumstances, a reasonable one. The proofs should be limited in the usual manner by the sense and discretion of the trial court.
In fairness a reasonable period of discovery should be allowed on remand. Plaintiff is directed to immediately move before the trial court for an order for discovery within a time frame fair to plaintiff and to defendants FRA and Ferrone.
We can conceive of no reason why defendant New Jersey Racing Commission should be continued in the matter presented by appeal number one. Defendant Ferrone's action was taken solely on behalf of FRA, his employer, was not done pursuant to any regulation of the NJRC nor was it authorized by that body. The dismissal of the complaint so far as the NJRC is concerned is therefore affirmed because the matter presented is a private one that may give rise to a claim of private damage.
Without the benefit of further facts we cannot, on these affidavits, determine whether plaintiff's claimed right to a restraint pending final resolution has merit. The likelihood that plaintiff will prevail on the merits is not adequately presented on this record nor is the record clear that the harm suffered by plaintiff is truly irreparable since plaintiff is not precluded from racing this horse at tracks in other states and in this State at times when such tracks are in operation. Plaintiff's request for such a restraint is therefore denied without prejudice to the right to renew the request, if still desired, on remand.
To the extent plaintiff has argued federal due process and equal protection issues, we find no proof here presented of state action and reject such issues as clearly without merit. R. 2:11-3(e)(1)(E). The argument that FRA's action "constitutes an unreasonable restraint on trade" (an argument presented without reference to any statutory or case law) we equally find clearly without merit. R. 2:11-3(e)(1)(E).
*496 For the reasons expressed the order of September 16, 1981, insofar as it pertains to defendants FRA and Ferrone, is reversed and the matter is remanded for proceedings consistent with this opinion.

II. Appeal Number Two

The dispute presented by the pleadings in this case was one solely involving the opposing common law rights of a racehorse owner and a racetrack proprietor. The exclusionary action taken by defendant FRA through its employee Ferrone was not done under color of, nor pursuant to, any regulation of defendant NJRC. The NJRC is empowered by N.J.S.A. 5:5-30 "to prescribe rules, regulations and conditions under which all horse races shall be conducted" in this State. Pursuant to that statute it has, as to harness racing, promulgated regulations for that purpose. N.J.A.C. 13:71-1.1 et seq. None of these regulations attempt to regulate the issue here presented, i.e., the right of a licensed horse owner to race his horse at a given track. We need not decide whether the NJRC has power to regulate that right. It is sufficient for present purposes to note that it has not done so and has here, consistent with that approach, regarded the matter as one which "concerns a purely business related decision of the Freehold Raceway and its racing secretary."
We agree with this position. Plaintiff, moreover, seeks not only to enforce his common law rights but to obtain restraints and money damages as well. Clearly, his remedy lies in the courts. Appeal No. A-5580-80T2 is, therefore, dismissed.

III.
In summary, the order of judgment appealed in case No. A-5579-80T2 is affirmed as to defendant New Jersey Racing Commission but reversed and remanded as to defendants Frank Ferrone and Freehold Raceway Association. The appeal in No. A-5580-80T2 is dismissed. We do not retain jurisdiction.
NOTES
[1] We have not been supplied a record of this hearing, as required by R. 2:5-3(a) and R. 2:6-12(d). We are advised by appellant's counsel that the reporter could not locate the notes of this hearing.
[2] It would appear that the trial judge felt he had no subject matter jurisdiction by reason of this court's decision in Bishop v. N.J. Sports & Exposition Auth., 168 N.J. Super. 533 (App.Div. 1979). The second ground for dismissal, failure to state a claim upon which relief can be granted, was apparently grounded upon the decisions in Garifine v. Monmouth Park Jockey Club, 29 N.J. 47 (1959), and Martin v. Monmouth Park Jockey Club, 145 F. Supp. 439 (D.N.J. 1956), aff'd 242 F.2d 344 (3 Cir.1957).
[3] Although Garifine addressed in considerable detail the common law exclusionary right, it appears to be a case which focuses upon the fact that the ejected plaintiff was an "undesirable" person suspected of being a bookmaker. It was so regarded by this court in its decision in Uston 179 N.J. Super. 223, 226 (App.Div. 1981). The Supreme Court's decision in Uston appears to take the same view of the Garifine holding. Id., 89 N.J. at 174, n. 5. The following quotation from the Garifine decision gives support to such an interpretation. The italicized portion evinces an other than obdurate adoption of the absolute exclusionary rule and seems to leave open a door later entered by the same court in Uston:

The burden of the plaintiff's present attack is on the common-law doctrine which he states should be altered to afford to him a right of admission to the race track in the absence of affirmative legal proof by the defendant that there is good cause for his exclusion. We are satisfied that, without regard to views which may be entertained in other types of cases, there has been no showing made here for such alteration. The plaintiff's complaint states that the defendant advised him that he is not wanted at the race track and that his general record and reputation warrant his exclusion. It does not question the defendant's good faith or sound purpose nor does it present any countervailing circumstances or any urgent considerations of justice or policy which might move a court to depart from the many judicial decisions which have sustained the common-law right of race track operators to exclude suspected undesirables. [29 N.J. at 57; emphasis supplied]
In any event, to the extent that Uston and Garifine may be deemed to conflict in principle, the latter seems overruled, sub silentio, by the former.
[4] Plaintiff has not pleaded any state constitutional issue. In the absence of such issue and because the case can be resolved under common law principles we need not explore the question. Because the matter must be remanded, however, and the issue may therefore arise by amendment we note that the "federal requirements concerning `state action' founded primarily in the language of the Fourteenth Amendment and in the principles of federal-state relations, do not have the same force when applied to state based constitutional rights." Schmid at 559-560. We observe that N.J.Const. (1947), Art. I, § I, par. 1, grants to all persons "certain natural and unalienable rights, among which are those of ... acquiring, possessing, and protecting property...." Cf. Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 76-78 (1978).