Harvey ZISKIS

v.

Beatrice KOWALSKI.

Civ. No. H–80–487(AHN).

United States District Court,
D. Connecticut.

Dec. 7, 1989.

Sue Wise, Williams & Wise, New Haven, Conn., for plaintiff.

April Haskell, Montstream & May, Glastonbury, Conn., Deborah Freeman, Skelley, Vinkles, Williams & Rottner, Richard Sheridan, Attorney General's Office, Hartford, Conn., for defendant.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

On August 30, 1977, Harvey Ziskis was summarily ejected from the jai-alai fronton in Hartford, Connecticut. He brought suit in 1980, pursuant to 42 U.S.C. Section 1983 and Connecticut common law, against various officials of the State of Connecticut and the Connecticut Commission on Special Revenue (now the Division of Special Revenue) (collectively, the "public defendants"), and Hartford Jai–Alai, Inc., World Jai–Alai, Inc., WJA Realty, and EHP Corporation (collectively, the "private defendants"). Nine years and a multitude of pleadings, motions, and rulings later, the court has before it cross-motions for summary judgment, brought by the plaintiff, the public defendants, and the private defendants. For the reasons that follow, the plaintiff's motion for summary judgment is denied and the defendants' motions for summary judgment are granted.

### Background

The undisputed facts in this case support the following narrative.[1] The plaintiff Harvey Ziskis ("Ziskis"), at times prior to this action, was a frequent bettor at jai-alai games. Defendant Hartford Jai–Alai, Inc. ("HJA") was a private corporation licensed by the State of Connecticut Commission on Special Revenue ("Commission") to operate the Hartford Jai–Alai fronton and was subject to the Commission's rules and regula-

---

1. The defendant contends that there are facts in dispute but the court concludes that the dis-   puted facts are not relative to its fundings.

tions. Defendants World Jai–Alai, Inc., WJA Realty and EHP Corporation are or were private organizations with ownership or associated interests in HJA.

On August 30, 1977, Ziskis was ejected and permanently barred from the Hartford Jai–Alai fronton after he had cashed, but retained possession of, a winning jai-alai ticket.[2] The ejection was effected by Gerald Coakley, then assistant general manager and director of security of HJA, in accordance with Commission Regulation 12–574–D25(c)(2),[3] then in effect. Subsequent to his ejection, the plaintiff unsuccessfully appealed to fronton management for reinstatement and to the Commission on Special Revenue for a hearing. In the absence of a statutory and/or regulatory requirement to comply, the Commission did not respond.[4]

In September of 1977, after being denied reinstatement by fronton management, the plaintiff brought allegations before the Commission of various wrongdoings taking place at the Hartford Jai–Alai and other frontons in the state. The Commission initiated an investigation into plaintiff's allegations on systems betting and commenced a formal inquiry through a series of hearings which extended from November 1977 until January 1978. The plaintiff testified at those hearings regarding his claimed knowledge of violations of Commission rules and regulations by HJA management. In the course of the Commission's investigation, Commission representatives received reports from employees of HJA alleging that the plaintiff was involved in "game fixing" at the state jai-alai frontons,[5] and that HJA had failed to report these allegations to the Commission. As a result, the Commission held disciplinary hearings in March and April, 1978 concerning HJA's noncompliance with Commission rules. At the hearings, Ziskis was subpoenaed but refused to testify, relying on his fifth amendment privilege to remain silent.

In March 1978, the Commission invited Ziskis to submit a written specific request

2. The Notice form, with the name of the plaintiff filled in, stated that:
   The Management of Hartford Jai–Alai, Inc. has determined that the presence of Harvey L. Ziskis ... on the property of Hartford Jai–Alai is not desirable. The Management of Hartford Jai–Alai has further determined that Harvey L. Ziskis is an undesirable individual who is hereby barred from the premises of Hartford Jai–Alai permanently.
   The reason for the ejection was handwritten at the bottom of the form as follows: "Subject presented trifecta ticket for 9th game and took it back after he was paid for it. Window # 167."

3. Conn. Agencies Regs. Section 12–574–D25(c)(2) provides that:
   [A]n Association conducting Jai Alai games under license from the Commission shall eject from its grounds all unauthorized persons, known undesirables, touts, persons believed to be bookmakers or connected with bookmakers, persons under suspension or ruled off, persons of lewd or immoral character, and persons guilty of other conduct detrimental to Jai Alai or the public welfare.

4. There existed at the time no statutory or regulatory enactments which provided for patron ejectment or reinstatement. *Herman v. Division of Special Revenue,* 193 Conn. 379, 477 A.2d 119 (1984). Provision for patron ejectment and reinstatement was made in Conn. Agencies Regs. Section 12–574–D–35 (effective Nov. 22, 1982), *see infra* note 12.

5. Because of Ziskis's allegations regarding player fixing at HJA, the Commission conducted hearings from November 1977 to January 1978 on the operation of "systems betting" at Hartford Jai–Alai and in March–April 1978 on HJA's non-compliance with Commission Regulations. In its final decision, *In the Matter of the Commission on Special Revenue v. Hartford Jai–Alai* (Sept. 20, 1978), the Commission found that John Dewees, an employee of HJA who worked for Rodney Woods, a large systems bettor, had informed HJA's Director and Chief of Security Gerald Coakley that
   [I]n April 1977 ... Mr. Ziskis allegedly stated to Dewees that he had some players under his control, that he was paying certain players to throw points thereby insuring that they would finish out of the money in a particular game, and that he wanted Dewees to leave out certain numbers when Dewees punched tickets for certain systems bettors, and that they would then split the money that was left out between he (sic) and Ziskis.
   *Id.* at 3. This conversation was reported to the management of HJA who failed to report these violations to the Commission. Instead, HJA conducted its own investigation and, having formed an opinion that Ziskis was an undesirable person at the fronton, made no effort to eject him. As a result, the Commission and state police were not able to investigate the player fixing allegations. The Commission thus fined Hartford Jai–Alai and closed it down for a week from September 27 to October 7, 1978.

for a hearing. On May 15, 1980, Ziskis requested "a patron reinstatement hearing." The Commission agreed to hold a patron reinstatement hearing, even though not required by statute or regulation to do so, with the reservation that Ziskis be prepared to answer questions about the allegations made against him concerning player fixing. A hearing was scheduled and held on September 8, 1980. However, Ziskis did not attend.[6]

### Discussion of the Law

A. Cross–Motions For Summary Judgment

To prevail on a Rule 56 motion, a movant must demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The burden of demonstrating the absence of a genuine issue rests with the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden does not shift when cross-motions are before the court: each motion must be judged on its own merits. *Schwabenbauer v. Board of Educ.,* 667 F.2d 305, 314 (2d Cir.1981). In the instant matter, the parties are not in dispute as to any of the material facts; instead, they differ in their interpretations of the law applicable to the case. Because resolution of questions of law is uniquely a judicial function, the court finds that the cross-motions have placed the disputed issues squarely before the court.

B. Existence of a Protectable Liberty or Property Interest in Gambling

■ The heart of this dispute involves whether or not there are protected property or liberty interests of which the plaintiff was deprived. The court finds that such

6. Ziskis did not attend on the advice of his attorney because the plaintiff wanted an ejection hearing rather than the reinstatement hearing requested in May; and because of objections about provision of a neutral hearing officer.

7. 42 U.S.C. Section 1983 provides:
Civil Action for Deprivation of Rights:
Every person who, under color of any statute, ordinance, regulation, custom, or usage

interests are not present and that there is no reason, therefore, to address other issues.

In this case the plaintiff claims that his ejection from Hartford Jai–Alai deprived him, under color of state law, of substantive and procedural due process—loss of liberty, suspension from his employment as a bettor, loss of livelihood, and deprivation of property without due process of law—in contravention of the first, fifth and fourteenth amendments and in violation of his civil rights under 42 U.S.C. Section 1983. The threshold issue before this court, therefore, is whether there exists a protected liberty or property interest in the profession of gambling, the deprivation of which constitutes a denial of due process and thus a violation of section 1983.

In order to maintain an action under section 1983, a plaintiff must show that he has been deprived of a constitutional right by a person acting under color of state law.[7] *Rodic v. Thistledown Racing Club,* 615 F.2d 736, 739, (6th Cir.), *cert. denied,* 449 U.S. 996, 101 S.Ct. 535, 66 L.Ed.2d 294 (1980). The initial inquiry, however, is whether the plaintiff has been deprived of any *protected* liberty or property interest. If there has been no deprivation of liberty or property, then no process is due and the court need not address the issue of whether the deprivation occurred under color of state law. As the Supreme Court stated in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property ... [t]o determine whether due process requirements apply in the first place, we must look not to the 'weight'

of any state or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

but to the *nature* of the interest at stake. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property."

*Id.* at 569–71, 92 S.Ct. at 2705. The Supreme Court in *Roth* defined a property right as a security interest which a person has acquired in a specific benefit:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .
>
> .     .     .     .     .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . .

*Id.* at 577, 92 S.Ct. at 2709. *See also Leis v. Flynt*, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979). Thus, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

To establish a property interest in this case, there must be a federal or state statute or rule of law or understanding that entitles the plaintiff to participate as a gambler in state parimutuel activities. Thus, in order for Ziskis successfully to argue that he was deprived of a hearing, he must first point to a specific state or federal law source for his claimed property or liberty interest in pursuing his profession of gambling. Unless Ziskis can clear this initial hurdle, the court need not even reach the state action question. *See Rodic*, 615 F.2d at 739.

### 1. *No Federal Property Interest in Gambling*

There is no federal rule of law creating a general right to be a patron of a jai-alai fronton or other gambling establishment. Title II of the Civil Rights Act of 1964, 42 U.S.C. Section 2000a(c), which deals with public accommodations, including places of amusement, creates only a right not to be discriminated against on the basis of race, color, religion, or national origin. Indeed, the plaintiff does not argue that there exists a right to gamble secured by the Constitution, claiming instead that "[i]t was purely and simply the existence of State laws which gave rise to the plaintiff's protectable liberty and property interests." Plaintiff's Memorandum in Support of Motion for Summary Judgment at 28, n. 9 ("Plaintiff's Memorandum").

### 2. *No Property Interest in Connecticut For a Patron To Gamble*

The plaintiff contends that he had a legitimate claim of entitlement, a property interest in pursuing his career in gambling, secured by existing state law. The plaintiff cites Conn.Gen.Stat. Section 53–35 [8] as a state law source for his entitlement to attend jai-alai exhibitions. Plaintiff's Memorandum at 18. This statute, which deals with public accommodations, including places of amusement, like the federal statute, creates only a right not to be discriminated against on the basis of race, color, religion, or national origin. It does not provide a patron with a constitutional right to attend jai-alai exhibitions.

The plaintiff also cites Conn.Gen.Stat. Section 12–573a,[9] authorizing the operation

---

**8.** Conn.Gen.Stat. Section 53–35 provides:

**Discrimination in public accomodations and rental housing on account of race, creed or color.**

> All persons within the jurisdiction of this state shall be entitled to full and equal accommodations in every place of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons; and any denial of such accommodation by reason

of race, creed or color of the applicant therefor shall be a violation of the provisions of this section.

**9.** Conn.Gen.Stat. Section 12–573a provides:

**Operation of Frontons**

> The board may authorize the operation of frontons in the state for exhibition of the Spanish ball game called jai alai or pelota. The operation of all frontons shall be under the supervision of the division.

of frontons, and Conn.Gen.Stat. Section 12–574,[10] requiring the licensing of gambling related activities, which the plaintiff refers to as "special revenue activities," as state law sources for his entitlement to pursue his career in gambling. Plaintiff's Memorandum at 18, n. 7, 20. Yet the list of gambling-related activities enumerated in

10. Conn.Gen.Stat. Section 12–574 provides:
**Licensing.**

(a) Association licensees. No person or business organization may conduct a meeting at which racing or the exhibition of jai alai is permitted for any stake, purse or reward unless such person or business organization is licensed as an association licensee by the board. Any such licensee authorized to conduct a meeting shall indemnify and save harmless the state of Connecticut against any and all actions, claims, and demands of whatever kind or nature which the state may sustain or incur by reason or in consequence of issuing such license.

(b) Affiliate licensees licensed by board. After July 1, 1980, no business organization, other than a shareholder in a publicly traded corporation, may exercise control in or over an association licensee unless such business organization is licensed as an affiliate licensee by the board.

(c) Concessionaire licensees. No person or business organization may operate any concession at any meeting at which racing or the exhibition of jai alai is permitted or any concession which is allied to an off-track betting facility unless such person or business organization is licensed as a concessionaire licensee by the executive director.

(d) Vendor licensees. After July 1, 1980, no person or business organization awarded the primary contract by the state to provide facilities, components, goods or services which are necessary for the operation of the activities authorized by the provisions of sections 12–568 and 12–572 may do so unless such person or business organization is licensed as a vendor licensee by the executive director.

(e) Totalizator licensees. After July 1, 1980, no person or business organization may provided totalizator equipment and services to any association licensee for the operation of a pari-mutuel system unless such person or business organization is licensed as a totalizator licensee by the executive director.

(f) Affiliate licensees licensed by executive director. After July 1, 1980, no business organization, other than a shareholder in a publicly traded corporation, may exercise control in or over a concessionaire, vendor or totalizator, licensee unless such business organization is licensed as an affiliate licensee by the executive director.

(g) Occupation licensees. No person may participate in this state in any activity permitted under this chapter as an employee of an association, concessionaire, vendor, totalizator or affiliate licensee unless such person is licensed as an occupational licensee by the executive director. Whether located in or out of this state no officer, director, partner, trustee or owner of a business organization which obtains a license in accordance with this section may continue in such capacity unless such officer, director, partner, trustee or owner is licensed as an occupational licensee by the executive director. An occupational license shall also be obtained by any shareholder, key executive, agent or other person connected with any association, concessionaire, vendor, totalizator or affiliate licensee, who in the judgment of the executive director will exercise control in or over any such licensee. Such person shall apply for a license not later than thirty days after the executive director requests him, in writing, to do so.

(h) Type of license in question: Determination. After July 1, 1980: (1) If any business organization qualifies to be licensed either as an affiliate of an association licensee or as a concessionaire, such business organization shall be licensed as an affiliate licensee by the board; (2) if any business organization qualifies to be licensed either as an affiliate of a concessionaire licensee or as a concessionaire, such business organization shall be licensed as an affiliate licensee by the executive director.

(i) Information required for licensing. Licensing and regulation of licensees by executive director. In determining whether to grant a license the board or the executive director may require the applicant to submit information as to: Financial standing and credit; moral character; criminal record, if any; previous employment; corporate, partnership or association affiliations; ownership of personal assets; and such other information as it or he deems pertinent to the issuance of such license. The executive director may reject for good cause an application for a license, and he or any unit head authorized by him may suspend or revoke for good cause any license issued by him after a hearing held in accordance with chapter 54. In addition, if any affiliate licensee licensed by the executive director fails to comply with the provisions of this chapter the executive director, after a hearing held in accordance with chapter 54, may revoke or suspend the license of any one or more of the following related licensees: Concessionaire, vendor or totalizator, and may fine any one or more of said licensees in an amount not to exceed two thousand five hundred dollars. Any licensee whose license is suspended or revoked, or any applicant aggrieved by the action of the executive director concerning an application for a license may appeal not later than fifteen days after such decision to the board in accordance with subsection (j).9.

the statute regulating licensing, such as operating gambling associations, and working as a concessionaire, vendor, or totalizator at a state-licensed gambling facility does *not* include gambling per se. Indeed, the State of Connecticut does not grant patrons licenses to gamble. Thus, plaintiff's reliance on this statute licensing gambling-related activities for his state-created entitlement to gamble is misplaced, since gambling is not a licensed activity, and it is the licensing of an activity which has been held to create a property interest.[11] In *Staino v. Pennsylvania State Horse Racing Comm'n*, 98 Pa.Commw. 461, 470, 512 A.2d 75, 78 (1986), the court distinguished a licensee from a patron:

> The difference in procedural due process accorded patrons and licensees can be explained [by the fact that] [l]icensees, unlike patrons, have more than an abstract desire for or a unilateral expectation of admission to the racetrack by virtue of the license given them to exercise their occupation at the race track. Denial of admission to or ejection of a licensee thus constitutes denial of the liberty to exercise his occupation which triggers the procedural protections of the Fourteenth Amendment.

*See also Cox v. National Jockey Club*, 25 Ill.App.3d 160, 167, 323 N.E.2d 104, 109 (1974) (distinguishing a racetrack owner's common law right to exclude patrons from the exclusion of a licensed jockey "who was being arbitrarily deprived of his fundamental right to engage in his chosen occupation"); *Jacobson v. New York Racing Ass'n*, 33 N.Y.2d 144, 150, 350 N.Y.S.2d 639, 642–43, 305 N.E.2d 765, 768 (1973) (contrasting a racetrack proprietor's "common-law right to exclude undesirable patrons" with "an absolute immunity from having to justify the exclusion of an owner

and trainer whom the State has deemed fit to license"). In contrast, the plaintiff's characterization of gambling, although unlicensed, as a special revenue activity thereby entitling him to a protected property interest in gambling is not supported by the caselaw. Although the plaintiff claims to have been licensed as a food concessionaire who could not get his license renewed because of the ejection and subsequent ruling off, that claim is not in the complaint; nor is there supporting evidence in the materials submitted with the plaintiff's motion for summary judgment. Nor can the plaintiff claim a property right to a license in other gambling-related activities from which he may have been banned as a result of the ejection, i.e., the ability to race dogs in other states. Rather, a property right arises, if it arises at all, only after a license has been granted. *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (it is the alteration or extinguishing of a right or status previously recognized by state law that invokes the procedural questions contained in the due process clause). In *Lasky v. Van Lindt*, 115 Misc.2d 259, 263, 453 N.Y.S.2d 983, 986 (1982), the court upheld the denial of a thoroughbred racehorse owner's license to a professional tout since there is no absolute right to a racehorse owner's license and thus no claim of entitlement requiring a hearing, since licensing touts was not in the best interests of racing. As the first circuit stated in *Medina v. Rudman*, 545 F.2d 244, 245, 250 (1976), the state had created no vested right or status in favor of potential greyhound license applicants, although once a license is granted "a right or status recognized under state law would come into being, and the revocation of the license would require notice and a hearing."

---

**11.** In *Barry v. Barchi*, 443 U.S. 55, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), the Supreme Court upheld a New York statute authorizing summary suspensions of (licensed) harness racing trainers without a presuspension hearing so long as the licensed trainer would be assured a prompt postsuspension hearing. The Court did not, however, hold that a licensee automatically had a property interest in a license, thus implying that a property interest in a license exists "only

because the regulatory schedule created such an interest ... that while the regulatory scheme did engender an entitlement in this instance, it was not constitutionally required to do so. In other words, had New York law been different, had the authorities enjoyed unbridled discretion to terminate the licensee's possession of a license, no such property interest would have existed." *Legal Aspects of Public Gaming*, 12 Conn.L.Rev. at 875.

The licensing statute is an inapposite source of a state law entitlement to gambling. It concerns the licensing of activities for the purpose of regulating gambling (because it is a suspect activity) rather than the rights of patrons to participate in gambling. The weight of the case law upholds the common law rule that owners of places of amusement, like theaters and racetracks, are permitted to exclude patrons without cause. At common law a person engaged in a public calling, such as an innkeeper or common carrier, was held to have a duty to the general public to serve without discrimination all who sought service. In contrast, owners of private enterprises, such as places of amusement and resort, were under no such obligation, enjoying an absolute power to serve whom they pleased. *Madden v. Queens County Jockey Club*, 296 N.Y. 249, 253, 72 N.E.2d 697, 698, *cert. denied*, 332 U.S. 761, 68 S.Ct. 63, 92 L.Ed. 346 (1947). *See also Marrone v. Washington Jockey Club*, 227 U.S. 633, 636, 33 S.Ct. 401, 402, 57 L.Ed. 679 (1913) (Holmes, J.) (upholding the common law rule that a ticket of admission to a racetrack does not create a right in rem precluding patron's ejection); *Brooks v. Chicago Downs Ass'n*, 791 F.2d 512, 519 (7th Cir.1986) ("the common law rule, relic though it may be, still controls," conferring an absolute right to owners of racetracks to eject undesirable patrons); *People v. Licata*, 28 N.Y.2d 113, 115, 320 N.Y.S.2d 53, 55, 268 N.E.2d 787, 788 (1971) (reaffirming *Madden* based on a regulation similar to the Connecticut rule under which Ziskis was ejected); *Contra Uston v. Resorts Int'l Hotel*, 89 N.J. 163, 175, 445 A.2d 370 (1982) (casino precluded from excluding patron based on his "card counting" method of playing blackjack, where there was no indication that patron violated any Commission rule on the playing of blackjack.) *But see Marzocca v. Ferone*, 93 N.J. 509, 516, 461 A.2d 1133, 1137 (1983) (reaffirming the common law right of racetrack owner in New Jersey to exclude "notwithstanding the dicta in *Uston*.")

The plaintiff argues that since he was ejected pursuant to a Commission regulation, the common law right to exclude patrons had been abrogated. However, the case law supports the defendants' contention that the Connecticut regulation under which Ziskis was ejected did no more than codify the existing common law. Private Defendants' Memorandum of Law in Support of Objection to Plaintiff's Motion for Summary Judgment and In Support of Defendants' Motion for Summary Judgment at 25 ("Private Defendants' Memorandum"). The courts of other jurisdictions have held that despite heavy regulation, the common law of exclusion was not changed. *Silbert v. Ramsey*, 301 Md. 96, 106, 482 A.2d 147, 153 (1984) (regulations concerning the authority to exclude tipsters and the makers of handbooks and unauthorized persons not intended to change the common law right to exclude undesirables); *James v. Churchill Downs, Inc.*, 620 S.W.2d 323, 325 (Ky.Ct.App.1981) (statute vesting the racing commission with authority to exclude undesirables from racetracks did not abrogate the common law right); *Tropical Park, Inc. v. Jock*, 374 So.2d 639, 640 (Fla.Dist.Ct.App.1979), *cert. denied*, *Jock v. Tropical Park, Inc.*, 383 So.2d 1196 (1980) (statute requiring operator of racetrack to exclude or prevent certain persons from being patrons did not preempt the common law right to exclude); *Nation v. Apache Greyhound Park, Inc.*, 119 Ariz. 76, 78, 579 P.2d 580, 582 (1978) (regulation authorizing racetrack to exclude patrons " 'whose conduct is objectionable to the public or contrary to the best interests of racing, including all persons ruled off by the stewards,' " held to be a codification of the common law); *Tamelleo v. New Hampshire Jockey Club, Inc.*, 102 N.H. 547, 550, 163 A.2d 10, 13 (1960) (regulation authorizing licensed racetrack to eject any person " 'whose presence . . . in the sole judgment of said licensee [is] inconsistent with the orderly and proper conduct of a race meeting' " is "substantially declaratory of the common law which permits owners of private enterprises to refuse admission or to eject anyone whom they desire.") *See also Madden*, 296 N.Y. at 254, 72 N.E.2d at 698 ("the common law power of exclusion . . . continues until changed by legislative enactment."). *But see Burrillville Racing*

*Ass'n v. Garabedian*, 113 R.I. 134, 138–39, 318 A.2d 469, 472 (1974) (common law right to exclude patron from racetrack changed by a statute authorizing a racetrack operator to exclude a person from its premises who in its sole discretion was undesirable) (held in *Nation*, 119 Ariz. at 78, 579 P.2d at 582, to be "wrong") and *Narragansett Racing Ass'n v. Mazzaro*, 116 R.I. 354, 355, 357 A.2d 442 (1976) (holding that the racetrack operator could not exclude a person from its premises without making a determination that such a person was undesirable).[12]

Furthermore, the regulation under which Ziskis was ejected did not require a hearing.[13] In the only case involving a patron

12. Although the weight of the case law supports the common law rule affording a proprietor the absolute right to exclude, in most cases invoking patron ejection the facts reveal that just cause existed for the exclusion, since most proprietors do not exclude customers without reason. *See, e.g., Brooks v. Chicago Downs Ass'n, Inc.*, 791 F.2d 512, 516–17 (7th Cir.1986) *citing Silbert v. Ramsey*, 301 Md. 96, 482 A.2d 147 (1984) (ejected patron had prior conviction for violation of state lottery laws); *James v. Churchill Downs, Inc.*, 620 S.W.2d 323 (Ky.App.1981) (ejected patron was a convicted bookmaker); *Tropical Park, Inc.*, 374 So.2d at 639 (ejected patron had known underworld connections); *Burrillville Racing Ass'n v. Garabedian*, 113 R.I. 134, 318 A.2d 469 (1974) (ejected patron had prior conviction for income tax evasion connected with wager messenger operation). In contrast in *Uston v. Resorts Int'l Hotel*, 89 N.J. 163, 445 A.2d 370 (1982), which held that a card counter could not be excluded, the patron had not violated any rule or regulation but simply had the ability to remember every card.

13. Conn. Agencies Reg. Section 12–574–D–35. Ejection of Persons

a. **Ejection.** Through its director of security or his duly authorized representative an associate shall eject from its grounds all unauthorized persons, known undesirables, touts, persons believed to be bookmakers or connected with bookmakers, persons whose licenses are revoked or under suspension, ejected persons, persons of lewd or immoral behavior, and persons engaging in boisterous or disorderly conduct or other conduct with may be detrimental to jai alai or the public welfare. Likewise, the division on its own initiative may eject such aforesaid persons.

b. **Division Notification.** It shall be the duty of each Association, through its Director of Security, to notify the Division of all ejections and arrests, giving name and address of the ejectee and the specific nature of the offense.

c. **Ejectee Notification.** Every person ejected by the Association or the Division shall be notified in writing of his ejection and the specific reason therefore. All ejection notices shall contain appropriate language informing the person ejected of his right to a hearing and the procedures involved. If ejected by an Association a copy of the ejection notice issued by the Association shall be immediately filed with the Division.

d. **Ejection Hearing.** Any person ejected by either the association or the division shall have the right to a hearing by the board of judges concerning the propriety of such ejection upon written request to the division within seven (7) days of the ejection. Such hearing shall be held pursuant to Division Rules of Practice and Hearing Procedures.

e. **Ejectee reinstatement.**

1. Any person ejected by either the association or the division shall have the right to a hearing to show reasons why he should be readmitted to the association facility and such ejection should be terminated. Such hearing shall be held pursuant to Division Rules of Practice and Hearing Procedures.

2. The board of judges has the authority to conduct a reinstatement hearing either on its own motion or upon the written petition of the party ejected. As soon as practicable the board of judges shall schedule a hearing and notify the ejectee of the place, date, the time thereof and the procedures involved.

The board of judges may order the appearance of any licensee at the hearing who in its opinion may be necessary for the efficient administration of justice. After the hearing the board of judges may either uphold the ejection, modify it in any manner or order the ejectee's reinstatement. In any case written notice of the board of judges' findings and decisions thereon shall be promptly delivered to the ejected person and the association.

3. An association may on its own reinstate a person and must immediately file a copy of its reinstatement notice with the division. The division reserves the right within three (3) business days of receipt of notice to approve or disapprove said reinstatement, and no association reinstatement will be effective until the end of this period. Any person whose association reinstatement has been disapproved shall be so notified in writing by the division. This notice shall inform the said person of his right to a hearing before the board of judges concerning the circumstances of his ejection and the division's determination to disapprove his reinstatement.

f. **Effect of Ejection.** Anyone who has been ejected or whose license has been suspended or revoked by the official regulatory body having jurisdiction where the offense occurred, whether within or without the State of Connecticut, shall be denied admission to or attendance at all facilities licensed by the

ejection from a jai-alai fronton in Connecticut, *Herman v. Division of Special Revenue*, 193 Conn. 379, 477 A.2d 119 (1984), the Connecticut Supreme Court held that the reinstatement hearing held by the Division of Special Revenue upon the request of a patron ejected from the Milford Jai–Alai Fronton in 1979, pursuant to the same regulation under which Ziskis was ejected, did not qualify as a hearing because the plaintiff lacked the "right to be heard" under the statute. 193 Conn. at 387, 477 A.2d at 124.

Thus, Connecticut law creates no right of admission to jai-alai, no right not to be ejected, no property right of which Ziskis was deprived, and, therefore, no entitlement to a hearing. On similar facts, the Court of Appeals for the Sixth Circuit in *Rodic*, 615 F.2d at 736, addressed the question whether a patron at an Ohio racetrack had been deprived of a constitutional right when he was barred permanently from the racetrack without receiving a hearing.[14] The sixth circuit stated that *Rodic* had no property interest in attending races at Thistledown since there was no federal law creating a general right to be admitted to racetracks and since Ohio law permitted racetracks to admit and exclude whom they pleased, so long as the exclusion was not based on race, creed, color, or national origin. The court held that Rodic "had no liberty or property interest in attending races at Thistledown on which to base a due process claim under Section 1983." *Rodic*, 615 F.2d at 738. In *Staino*, as in the instant case, the plaintiff was ejected pursuant to a regulation that did not specifically require a hearing in the event of a patron ejection, whereas a hearing was required, if requested, for an ejected licensee. 98 Pa.Commw. at 470, 512 A.2d at 79. The *Staino* court held that an ejected patron of a racetrack "has no constitutional right to a seat at the racetrack denial of which by state action would entitle him to the procedural protections of the Fourteenth Amendment" because "the statutory law of Pennsylvania accords no property right to a seat at a race track to a patron." 98 Pa. Commw. at 468, 512 A.2d at 78. Similarly, in *Medina v. Rudman*, 545 F.2d 244 (1st Cir.1976), *cert. denied*, 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 177 (1977), the court found the due process clause "inapplicable" and, consequently, a section 1983 claim groundless where a plaintiff's "interest in participating in the ownership of a parimutuel greyhound racetrack is neither a right recognized under New Hampshire law nor is it a 'fundamental' or 'natural' right." *Id.* at 250.

Like the ejected patrons in *Rodic* and *Staino*, Ziskis can point to no state statute, rule of law or understanding that entitles him to participate as a gambler in state parimutuel activities. He can thus make no claim that he was deprived of any protected property interest which would have entitled him to a due process hearing. The State of Connecticut accords no property right to gamble to a patron at jai-alai. Therefore, Ziskis had no property interest in gambling on which to base a due process claim under section 1983.

### 3. *No Liberty Interest in Gambling*

#### A. Gambling is not a Common Occupation

■ The plaintiff argues that by legalizing gambling in 1972, the State of Connecticut created a common occupation out of gambling related activities, including gambling per se, which plaintiff refers to as "special revenue activities." Plaintiff's Memo at 18 n. 7. Thus, the plaintiff claims that his ejection as a patron from Hartford Jai–Alai violated his "liberty interest in pursuing a common occupation in special revenue activities." To support this proposition, the plaintiff cites cases holding that there is a fundamental right to pursue a common occupation. In *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed.

---

Board or operated by the Division until duly reinstated or until the matter has been otherwise determined by the Division. (Effective March 21, 1984).

**14.** Rodic was ejected because he had used profane and vulgar language, threatened another racetrack patron, and had been a tout for at least two years before he was expelled. 615 F.2d at 738.

1042 (1923), the Supreme Court stated that the liberty guaranteed by the fourteenth amendment:

> denotes not merely freedom from bodily restraint but also the right of the individual to contract, *to engage in any of the common occupations of life,* to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Id.* at 399, 43 S.Ct. at 626 (emphasis added); *see also Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure.") Yet the plaintiff cites no cases which hold that gambling is a common occupation. However, in *Medina v. Rudman,* 545 F.2d 244, 251 (1976), the first circuit held, to the contrary, that racetrack ownership is not "one of life's 'common occupations.' Gambling is traditionally suspect in our society, and investment in such an enterprise, when permitted at all, is plainly open to the strictest kind of supervision." The *Medina* court affirmed the district court's rejection of "any notion that Mrs. Medina's application [for a license to own a racetrack] involved a 'fundamental' or 'natural' right— such as the right to earn a living and engage in one's chosen occupation—which might, apart from state law, be a protected 'liberty' interest." *Id.* at 249. Similarly in *Lasky v. Van Lindt,* 115 Misc.2d 259, 263, 453 N.Y.S.2d 983, 986 (1982) the court held that "... owning, training and racing horses is not one of life's common occupations." *See also* Note, *Legal Aspects of Public Gaming,* 12 Conn.Law Rev., 870, 874 (1980) (distinguishing gambling-related jobs and businesses from the common occupations).

These courts' characterization of only certain occupations as "common occupations" and therefore a protected liberty interest can be analogized to the Supreme Court's definition of a family by its living arrangements in *Moore v. East Cleveland,* 431 U.S. 494, 504–05, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (children living with a grandparent constitute a family) and in *Village of Belle–Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (unrelated people living together do not constitute a family). Similarly, certain professions have been held to constitute common occupations, while others, like gambling, traditionally a suspect activity, have not. Indeed, gambling remains a suspect activity in Connecticut, even though it has been legalized. *See King Int'l Corp. v. Voloshin,* 33 Conn.Supp. 166, 171, 366 A.2d 1172, 1175 (1976):

> While the state's heretofore ancient and deep-rooted policy of condemning gambling has been eroded to some degree by its legalization of certain types of gambling, the state has, nevertheless, been intransigent in its policy of prohibiting the extension of credit for the promotion of gambling activity—and with good reason. One need not have the gambling sagacity of the famed Las Vegas oddsmaker Jimmy the Greek to recognize the potential dangers in the extension of credit to the gambler or the possibly unfortunate incidents, to employ a euphemism, that could well result from the nonpayment of the gambling bettor to his creditor.

### B. No First Amendment Right to Gamble

■ Nor has gambling been held to be a first amendment right. The plaintiff argues that he had a first amendment right to associate with the other members of his profession of gambling. Yet, the plaintiff cites no cases to support this claim. In contrast, the court in *Allendale Leasing, Inc., v. Stone,* 614 F.Supp. 1440, 1454 (D.R. I.1985) held that "there is no First Amendment right to conduct or play Bingo, ... a game of chance; in less euphemistic terms, ... commonly known as gambling ... regardless of whether the game is completely

prohibited or statutorily permitted subject to regulation".

### Conclusion

Since the plaintiff has failed to show the existence of a liberty or property interest in pursuing gambling as a livelihood, this court holds that, as a matter of law, the plaintiff cannot claim entitlement to a due process hearing and, as a consequence, has no claim under 42 U.S.C. Section 1983. The plaintiff's motion for summary judgment is therefore denied. The defendants' motions for summary judgment are granted.

SO ORDERED.