ATTORNEY FOR APPELLANT
Marc S. Sedwick
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Peter J. Rusthoven
Paul L. Jefferson
Matthew S. Winings
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE
CASINO ASSOCIATION OF INDIANA
Fred R. Biesecker
John J. Thar
Jenny R. Wright
Indianapolis, Indiana

FILED
Sep 30 2010, 2:27 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 49S02-1003-CV-00124

THOMAS P. DONOVAN,

*Appellant (Plaintiff below)*,

v.

GRAND VICTORIA CASINO & RESORT, L.P.,

*Appellee (Defendant below)*.

Appeal from the Marion Superior Court, No. 49D05-0709-MI-39223
The Honorable Robyn L. Moberly, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-0903-CV-259

**September 30, 2010**

**Sullivan, Justice.**

An owner of an Indiana business has long had the absolute right to exclude a visitor or customer, subject only to applicable civil rights laws. This long-standing common law right of private property owners extends to the operator of a riverboat casino that wishes to exclude a pa-

tron for employing strategies designed to give the patron a statistical advantage over the casino. The Riverboat Gambling Act, which gives the Indiana Gaming Commission exclusive authority to set the rules of licensed casino games, does not abrogate this common law right.

## Background

Grand Victoria Casino & Resort, L.P. ("Grand Victoria"), owns and operates a riverboat casino located in Rising Sun, Indiana. One of the games offered by Grand Victoria is blackjack. Thomas P. Donovan supplements his income by playing blackjack in casinos. Donovan is a self-described "advantage player" who taught himself a strategy known as "card counting" that he employs when playing blackjack. Card counters keep track of the playing cards as they are dealt and adjust their betting patterns when the odds are in their favor. When used over a period of time, this method presumably ensures a more profitable encounter with the casino.

For a time, Grand Victoria allowed Donovan to play blackjack and card count if he wagered no more than $25 per hand. However, on August 4, 2006, Grand Victoria's director of table games advised Donovan that Grand Victoria had decided to ban Donovan from playing blackjack, though Donovan would still be allowed to play other casino games. After Donovan indicated that he would not comply with Grand Victoria's request, he was evicted and placed on Grand Victoria's list of excluded patrons.

Donovan filed suit against Grand Victoria, alleging breach of contract and seeking a declaratory judgment that Grand Victoria could not exclude him from playing the game of blackjack for counting cards. The trial court granted summary judgment in favor of the casino on both counts.

Donovan appealed. The Court of Appeals affirmed summary judgment for Grand Victoria on the breach of contract claim,[1] but it reversed summary judgment on the exclusion issue, holding that Donovan was entitled to a declaratory judgment that Grand Victoria had no right to exclude Donovan from blackjack for counting cards. The Court reasoned that Indiana has im-

---

[1] This issue has not been raised on transfer by either party. We summarily affirm the Court of Appeals. Ind. App. R. 58(A)(2).

plemented a comprehensive scheme for regulating riverboat gambling which partially abrogates a casino's common law right of exclusion. Donovan v. Grand Victoria Casino & Resort, L.P., 915 N.E.2d 1001, 1006 (Ind. Ct. App. 2009).

Grand Victoria sought, and we granted, transfer, thereby vacating the opinion of the Court of Appeals. Donovan v. Grand Victoria Casino & Resort, L.P., 929 N.E.2d 786 (Ind. 2010) (table).

**Discussion**

As set forth above, the Court of Appeals held that Grand Victoria had no right to exclude Donovan from blackjack for counting cards because Indiana has implemented a comprehensive scheme for regulating riverboat gambling that partially abrogates a casino's common law right of exclusion. Donovan, 915 N.E.2d at 1006. Grand Victoria maintains that its exclusion of Donovan from the game of blackjack was proper because at common law the arbitrary exclusion of a patron from places of privately owned amusements was not actionable absent a statute prohibiting such exclusion.

One of the time-honored principles of property law is the absolute and unconditional right of private property owners to exclude from their domain those entering without permission. See Brooks v. Chi. Downs Ass'n, 791 F.2d 512, 515-16 (7th Cir. 1986) (citations omitted); see also 2 William Blackstone, Commentaries on the Laws of England 2 (1766) (defining private property as "that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe"). In Bailey v. Washington Theatre Co., this common law right was explicitly extended to proprietors of privately owned amusements. 34 N.E.2d 17, 19 (1941). The patron in Bailey had sought an order compelling access to a privately owned theatre. In denying the patron relief, this Court held that "'[t]he proprietor of a theater, unlike a carrier of passengers, is engaged in a strictly private business. He is under no implied obligation to serve the public and . . . is under no duty to admit everyone who may apply and be willing to pay for a ticket.'" Id. (citation omitted). This long-standing principle of property law has been frequently reaffirmed, subject only to statutorily

imposed prohibitions on exclusions for characteristics such as race and religion.  Id.; see also Brooks, 791 F.2d at 515-16.  But we have never had occasion to explore the application of this rule to the riverboat casino industry, which is the precise issue in this appeal.

Donovan's principal contention is that any common law right that casinos might enjoy to exclude patrons from its premises has been preempted by the Indiana Gaming Commission's ("IGC's") exhaustive regulation of the riverboat casino industry, especially its comprehensive regulation of every aspect of the game of blackjack.  Grand Victoria responds that nothing in the Indiana Riverboat Gambling Act purports to abrogate common law exclusion rights; thus, absent express direction from the Legislature, the right remains intact.

The Legislature authorized riverboat casino gambling in 1993 "to benefit the people of Indiana by promoting tourism and assisting economic development."  Ind. Code § 4-33-1-2 (2005).  At the same time, the Legislature created the IGC and gave it the exclusive power and duty to administer and regulate riverboat gaming in Indiana.  See I.C. §§ 4-33-3-1 to -23; id. §§ 4-33-4-1 to -23.[2]

The IGC has promulgated minimum standards for blackjack.  See 68 Ind. Admin. Code 10-2 (2010).[3]  The regulations require a riverboat licensee to submit rules of the game for black-

---

[2] Under Indiana Code section 4-33-4-2, the Legislature endows the IGC with the authority to adopt rules for riverboat gambling for the following purposes:
    (1)  Administering this article.
    (2)  Establishing the conditions under which riverboat gambling in Indiana may be con-
        ducted.
    (3)  Providing for the prevention of practices detrimental to the public interest and pro-
        viding for the best interests of riverboat gambling.
    (4)  Establishing rules concerning inspection of riverboats and the review of the permits
        or licenses necessary to operate a riverboat.
    (5)  Imposing penalties for noncriminal violations of this article.

[3] Under this section, "blackjack" means an ace and second card with a point value of ten dealt as the initial two cards to a player or the dealer.  68 I.A.C. 10-2-1(d)(1).  A casino blackjack game starts with the dealer presenting and shuffling the cards.  68 I.A.C. 10-2-6.  The dealer spreads the cards out on the table for inspection, and then shuffles by hand or by an approved automatic shuffling device.  68 I.A.C. 10-2-6(a), (b).  The patron puts money on the table and the money is exchanged for chips.  Before the first card is dealt for a round of play, a player may make a wager in an amount not less than the minimum or more than the maximum amount set for the table.  68 I.A.C. 10-2-4(a).  After two cards have been dealt to each

4

jack if the casino intends to offer its patrons this game. See 68 I.A.C. 10-2-2(a). Additionally, individual casinos are permitted to submit additional rules for blackjack, including rules that can be used as countermeasures against card counting. See 68 I.A.C. 10-2-2(b). However, prior approval by the IGC is required before any additional rules may be employed by a casino. See 68 I.A.C. 10-1-3(c)(4) ("No rules of the game may be utilized by a riverboat licensee or riverboat license applicant unless the rules of the game have been approved, in writing, by the executive director."). And although the rules contain numerous provisions prohibiting certain conduct by patrons playing the game of blackjack, the mental exercise of counting cards is not expressly prohibited. See 68 I.A.C. 10-2-14.[4]

Relevant to this litigation, the IGC has also promulgated regulations governing a casino's right to exclude certain patrons. The IGC rules "do[] not preclude a casino licensee or operating agent from evicting a person from its casino gambling operation for any <u>lawful</u> reason." 68 I.A.C. 6-1-1(d) (emphasis added). Specifically the IGC requires

    (a) Each riverboat licensee shall maintain a list of evicted persons. Such list shall be comprised of persons who have been barred from a riverboat gaming operation for reasons deemed necessary by the riverboat licensee.

    . . . .

    (c) Each riverboat licensee shall have in place criteria for evicting persons and

---

player and to the dealer, each player must indicate a decision to "double down, surrender, split pairs, stand, draw, make an insurance wager, or make an even money wager." 68 I.A.C. 10-2-11(a). The dealer deals additional cards as necessary based upon the player decisions. The player wins if (1) "[t]he sum of the player's cards is twenty-one or less, and the sum of the dealer's cards is more than twenty-one"; (2) "[t]he sum of the player's cards exceeds that of the dealer without exceeding twenty-one"; (3) "[t]he player has a blackjack, and the dealer does not"; or (4) the player has a combination of cards "based on promotions offered by the riverboat licensee if the executive director has approved the promotion." 68 I.A.C. 10-2-4(a).

[4] The rules contain the following prohibitions:
    (a) A player may touch cards only as provided in this rule (68 I.A.C. 10-2).
    (b) A spectator may never touch the cards.
    (c) A dealer may not touch the cards with the dealer's person or any instrument in any manner that would alter, mark, bend, or otherwise allow any card to be distinguished from any other card.
    (d) No dealer or other riverboat licensee employee may permit player or spectator to engage in any activity that violates this rule (68 I.A.C. 10-2).
68 I.A.C. 10-2-14.

placing persons on its eviction list.  At minimum, the eviction criteria shall in-
clude the following behavior:
> (1) Cheating at a gambling game.
> (2) Theft.
> (3) Disorderly conduct.
> (4) Conduct that would lead the riverboat licensee to conclude that the person is a threat to the safety of other passengers, the licensee's employees, or employees and agents of the commission.
> (5) A person requests that his or her own name be placed on the riverboat licensee's eviction list.

68 I.A.C. 6-2-1.

The Court of Appeals held that the "strict regulation" of the casino industry evinced by the IGC's rules governing exclusion of certain patrons, coupled with the Legislature's decision to grant the IGC exclusive authority to set rules of riverboat casino games, specifically the game of blackjack, were dispositive evidence of the Legislature's intent to abrogate a casino's common law right of exclusion.  Donovan, 915 N.E.2d at 1006.  We respectfully disagree.

In Bailey, we recognized that regulation of an industry in isolation does not abrogate a private business's common law right of exclusion.  34 N.E.2d at 19 ("'The fact that the business is carried on under a license is generally regarded as not changing the character of the business from a private to a public one. . . . [I]n the absence of legislation to the contrary, the owner or manager of a place of public amusement may make and enforce [its own] rule[s] . . . .'" (citation omitted)).  Moreover, even if the IGC has been granted exclusive authority over the game of blackjack and the exclusion of patrons, which we do not decide here, it has delegated this authority to the holders of riverboat permits under its rulemaking authority.  In the words of the IGC, rules promulgated by the Commission "do[] not preclude a casino licensee or operating agent from evicting a person from its casino gambling operation for any lawful reason."  68 I.A.C. 6-1-1(d) (emphasis added); see also 68 I.A.C. 10-1-1(d) ("This article . . . sets forth the minimum standards within which games offered by riverboat licensees must be conducted." (emphasis added)).  Commission rules also delegate to the holders of riverboat permits exclusion rights "for reasons deemed necessary by the riverboat licensee."  68 I.A.C. 6-2-1(a).  We agree with Grand Victoria that such provisions at the very least do not evince an express intent by the Commission to alter common law exclusion rights.  (Appellee's Pet. to Transfer 8-9.)

6

Beyond this, the overwhelming weight of authority emanating from gaming jurisdictions rejects the notion that comprehensive regulation of the gaming industry, even where statutory or regulatory provisions directly address the exclusion of persons from such facilities, preempts a proprietor's common law right to arbitrarily exclude patrons. See Marrone v. Wash. Jockey Club, 227 U.S. 633, 636 (1913) (Holmes, J.) (upholding the common law rule that a ticket of admission to a racetrack does not create a right in rem precluding patron's ejection); Brooks, 791 F.2d at 513 (holding that "under Illinois law the operator of a horse race track has the absolute right to exclude a patron from the track premises for any reason, or no reason, except race, color, creed, national origin, or sex"); Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 740 n.3 (6th Cir. 1980) (construing Ohio gaming regulations authorizing exclusion as no more than the codification of a "racetrack owner's common law property right to eject or exclude patrons for reasons other than their race, creed, color[,] or national origin"), cert. denied, 449 U.S. 996 (1980); Ziskis v. Kowalski, 726 F. Supp. 902, 908 (D. Conn. 1989) ("The weight of the case law upholds the common law rule, that owners of places of amusement, like theatres and racetracks, are permitted to exclude patrons without cause."); Nation v. Apache Greyhound Park, Inc., 579 P.2d 580, 582 (Ariz. Ct. App. 1978) (regulation authorizing licensed racetrack to exclude patrons who proprietor's deemed objectionable held to be a codification of the common law right of arbitrary exclusion); Griffin v. Southland Racing Corp., 370 S.W.2d 429, 430-31 (Ark. 1963) (same); James v. Churchill Downs, Inc., 620 S.W.2d 323, 325 (Ky. Ct. App. 1981) (holding that a statute vesting the racing commission with authority to exclude undesirables from racetracks did not abrogate the common law right); Silbert v. Ramsey, 482 A.2d 147, 149-53 (Md. 1984) (regulations concerning the authority to exclude tipsters and the makers of handbooks and unauthorized persons not intended to preempt the common law right to exclude); Tamello v. N.H. Jockey Club, Inc., 163 A.2d 10, 13 (N.H. 1960) (regulation authorizing licensed racetrack to eject any person the licensee deems objectionable is "substantially declaratory of the common law which permits owners of private enterprises to refuse admission or to eject anyone whom they desire"); People v. Licata, 268 N.E.2d 787, 788 (N.Y. 1971) (same).[5]

---

[5] There is some authority to the contrary. See Uston v. Resorts Int'l Hotel, Inc., 445 A.2d 370 (N.J. 1982) (casino precluded from excluding patron based on his "card counting" method of playing blackjack, where there was no indication that patron violated any New Jersey Gaming Commission rule while playing the game of blackjack); Burrillville Racing Ass'n v. Garabedian, 318 A.2d 469, 471 n.2, 472 (R.I.

We find the reasoning of Justice Gudgel of the Kentucky Court of Appeals in <u>James</u> persuasive:

> [T]he legislature possesses the power to abrogate a common law right by enacting a specific statute which accomplishes that purpose. However, for us to conclude, as appellants have, that the mere enactment of statutes which confer upon the racing commission the authority to exercise a right of exclusion has the effect of abrogating the authority of racetrack proprietors to exercise an identical common law right they possess is unwarranted.

<u>Id</u>. at 325. We agree.[6] Grand Victoria enjoyed the common law right to exclude Donovan.

Donovan contends in the alternative that he has a legitimate claim of entitlement – a property interest in supplementing his income through gambling. In part, the Court of Appeals imputed a protectable property interest to Donovan from the absence of a particularized IGC rule prohibiting the practice of card counting. <u>See</u> <u>Donovan</u>, 915 N.E.2d at 1006. Grand Victoria responds that silence concerning the propriety of card counting "does not imply that licensees may not exercise their common law right to exclude card-counters. If anything, regulatory silence indicates intent to leave familiar exclusion practices undisturbed." (Appellee's Pet. to Transfer 7.)

We find <u>Uston v. Hilton Hotels Corp.</u>, 448 F. Supp. 116, 119 (D. Nev. 1978), instructive

---

1974) (holding that a statute permitting a racetrack licensee "the right to refuse admission to . . . any person or persons whose presence . . . is, in the sole judgment of said licensee . . . undesirable" altered the common law to require a factual determination that an ejected person is "undesirable").

[6] This does not mean that the comprehensive regulatory scheme enacted by the Legislature and implemented by the IGC did not abrogate any of the common law. <u>See</u> <u>Caesars Riverboat Casino, LLC v. Kephart</u>, __ N.E.2d __, No. 31S01-0909-CV-00403, slip op. (Ind. Sept. 30, 2010) (holding that the regulatory scheme abrogated any putative common law duty of casinos to protect compulsive gamblers). In this case, Donovan argues that because the regulatory scheme does not prohibit card counting, the common law right to exclude is abrogated. But while the common law duty on the part of a casino to exclude a compulsive gambler is incompatible with the regulatory scheme at issue in <u>Kephart</u> because the regulation imposes a duty instead on the gambler to register, there is nothing that makes the common law right to exclude incompatible, or even in conflict with, the regulatory scheme at issue in this case. The regulation here dictates the rules of the game of blackjack but in no way conflicts with or limits a casino from excluding smokers or college students or provocative dressers – or card counters.

8

on this point. In <u>Uston</u>, a card counter named Ken Uston (the same card counter who was the subject of the New Jersey litigation referenced in footnote 5 above and discussed below) argued that since the State of Nevada had enacted measures that required the exclusion of a limited class of undesirable persons, of which Uston was not a member, it thereby undertook the affirmative duty to compel the admittance of all persons, such as Uston, who were not named on the list compiled by the Nevada Gaming Commission. <u>Id.</u> The court held that "[s]uch an argument strains logic. It is the judgment of this Court that NRS 463.151[(Nevada's equivalent to IGC rule 68 I.A.C. 6-2-1)] gives rise to no affirmative obligation by the State of Nevada to compel gaming establishments to admit persons thought to be card counters." <u>Id.</u> We agree with the reasoning of the federal district court in Nevada. The mere fact that IGC regulations do not expressly compel the expulsion of card counters from casino facilities does not confer upon a patron an affirmative right of access to a casino's facilities.

Donovan also claims the benefit of an IGC regulation concerning the interpretation of its rules. <u>See</u> 68 I.A.C. 1-2-1 ("In the interpretation of any rules adopted by the commission, any ambiguity shall be resolved in favor of the interpretation which would provide: (1) the greater assurance of integrity in either the operation or regulation of riverboat gambling; or (2) heightened public confidence in the regulation or regulatory processes relating to riverboat gambling."). Donovan cites no support for the proposition that permitting card counting enhances integrity or public confidence in gaming operations or regulation. We see no basis for changing the common law on these grounds.

Lastly, Donovan urges Indiana to adopt the New Jersey Supreme Court's decision of <u>Uston v. Resorts Int'l Hotel, Inc.</u>, 445 A.2d 370 (N.J. 1982). Uston had been excluded from a New Jersey casino for card counting. <u>Id.</u> at 372. Like Donovan, Uston argued that a casino's common law right arbitrarily to evict patrons from its premises had been preempted by exhaustive gaming regulations governing New Jersey's casino industry. The <u>Uston</u> court held that the Casino Control Act gave New Jersey's gaming commission the exclusive authority to exclude patrons based upon their strategies for playing licensed casino games and that any common law right the casino may have had to exclude Uston for these reasons was abrogated by the Act and outweighed by Uston's right of access. <u>Id.</u>

9

The statutory language supporting the court's holding provided that the commission "shall establish such minimum wagers and other limitations as may be necessary to assure the vitality of casino operations and fair odds to and maximum participation by casino patrons." Id. The court noted that the New Jersey Act went into great detail in defining the rules of blackjack, and only the commission had authority to alter these rules. Id. at 373. Following this line of reasoning, the court found that the casinos had changed the rules of the game by excluding patrons based upon their method of play or their level of success. Id. The court ultimately concluded that such exclusions contravened the Legislature's express intent for the enactment of New Jersey's Casino Control Act: "[T]o assure . . . maximum participation by casino patrons." Id. at 372-73.

Indiana courts have never recognized a public right of access to private property. See Wilhoite v. Melvin Simon & Assocs., Inc., 640 N.E.2d 382, 385 (Ind. Ct. App. 1994) ("There is no law, rule, or understanding stemming from Indiana law, federal law or other source creating a right to be admitted to private property.") In fact, Wilhoite rebuffed the view "that because [a proprietor] opens itself to the public, it loses its character as private property." Id. at 387 (citing Lloyd Corp. v. Tanner, 407 U.S. 551, 570 (1972) ("Nor does property lose its private character merely because the public is generally invited to use it for designated purposes.")). And in contrast to the express intent for the enactment of New Jersey's Casino Control Act, our Legislature chose to legalize riverboat gambling "to benefit the people of Indiana by promoting tourism and assisting economic development," I.C. § 4-33-1-2, not to ensure maximum participation by casino patrons.

Acknowledging this lack of congruence between the two states' gaming statutes, Donovan argues that Grand Victoria opened its premises to the general public for tourism purposes and the arbitrary exclusion of patrons neither promotes tourism nor economic development. We are not persuaded. It seems to us just as likely – if not more so – that discouraging card counting enhances a casino's financial success and directly furthers the Legislature's express objective of promoting tourism and assisting economic development. In point of fact, New Jersey has come to recognize that card counting can threaten economic development. See Campione v. Adamar

of N.J., Inc., 714 A.2d 299, 305 (N.J. 1998) (acknowledging that gaming commission regulations sanctioning the use of card counting countermeasures were intended "to minimize the perceived threat of card counters to the statistical advantage that casinos need to remain profitable").

Other considerations counsel against adopting the position Donovan advances. In Brooks, the Seventh Circuit recognized that although it is "arguably unfair" to allow a place of amusement arbitrarily to exclude patrons, 791 F.2d at 518, there are sound public policy reasons in support of the common law rule of exclusion:

> [P]roprietors of amusement facilities, whose very survival depends on bringing the public into their place of amusement, are reasonable people who usually do not exclude their customers unless they have a reason to do so. What the proprietor of a race track does not want to have to do is prove or explain that his reason for exclusion is a just reason.

791 F.2d at 517 (emphasis omitted). In the words of the Arizona Court of Appeals,

> We are not persuaded that the common law rule of exclusion should be changed. The policy upon which it is based is still convincing. The [casino] proprietor must be able to control admission to its facilities without risk of a lawsuit and the necessity of proving that every person excluded would actually engage in some unlawful activity.

Nation, 579 P.2d at 582; see also Brief of Amicus Curiae at 8 ("Such decisions are, and should be, matters of business judgment to be evaluated and remedied by competitive market forces, not courts.").

## Conclusion

We affirm the judgment of the trial court.

Shepard, C.J., and Boehm, J., concur.

Dickson, J., dissents with separate opinion.

Rucker, J., not participating.

11

**Dickson, Justice, dissenting.**

I disagree with the Court's foundational premise that gambling casinos are entitled to the same common law right of arbitrary exclusion as possessed by proprietors of conventional businesses at common law. The privilege of operating a casino exists in Indiana only by recent special enactments of the Indiana General Assembly, and such operation is dependent upon specific authorization and comprehensive regulation of the Indiana Gaming Commission. It is only through the grace of such legislative and administrative permission that casinos exist in Indiana and are licensed and permitted to seek a profit by inviting the general public to participate in games that offer the prospect of reward for success. Permitting a casino to restrict its patrons only to those customers who lack the skill and ability to play such games well intrudes upon principles of fair and equal competition and provides unfair financial advantages and rewards to casino operators. I am not persuaded that such schemes are supported or protected by any common law right or privilege.

I believe the analysis and conclusion of the Court of Appeals is correct in this case. Donovan v. Grand Victoria Casino & Resort, L.P., 915 N.E.2d 1001 (Ind. Ct. App. 2009). It recognized the historic prohibition against gambling within Indiana's borders until selectively permitted in the past two decades and that it remains subject to "strict regulation." *See* Ind. Code § 4-33-4-2. The Indiana Gaming Commission, granted the exclusive authority to set rules of riverboat casino games, did not enact any prohibition against card counting nor did the defendant casino request Commission approval of such a rule. Card counting is not illegal under the exhaustive set of blackjack regulations promulgated by the Gaming Commission. *See* 68 Ind. Admin. Code 10-2-14. The regulations permit a riverboat licensee to impose additional blackjack rules but only if deemed necessary "to ensure the integrity of the game." 68 I.A.C. 10-2-2(b). I find that targeting unskilled blackjack players and excluding gifted ones is grossly incompatible with the integrity of the game.

The comprehensive, exclusive authority of the Indiana Gaming Commission is the basis of this Court's decision today in Caesars Riverboat Casino, LLC v. Kephart, ___ N.E.2d ___ (Ind. 2010). The Court in Kephart finds that Indiana's statutory scheme of riverboat gambling

regulation and the plaintiff's common law claim in that case are "so incompatible that they cannot both occupy the same space." *Id.* slip opin. at 6. If this is so, the same principle should be applied here. I dissent in <u>Kephart</u>, however, believing that the common law cause of action by an injured customer against a business operator failing to exercise reasonable care has not been expressly or unmistakably abrogated by Indiana's gambling statutes. But in the present case, I conclude that, because Indiana's gambling casino businesses exist only by statute and regulation, they are governed exclusively by the Commission's regulatory authority and not by common law.

I agree with the Court of Appeals conclusion that Grand Victoria should not be allowed to exclude the plaintiff from playing blackjack simply because the casino fears that he may be exceptionally good at it.

2